R. T. WEST ET AL. v. SEABOARD AIR LINE RAILWAY COMPANY.

(Filed 14 December, 1910.)

Railroads—Damages—Release—Mental Incapacity—Evidence—Conductor—Nonsuit.

> In this case, reported 151 N. C., 231, it was held necessary, to set aside plaintiff's release for damages for personal injuries sought in his action, for plaintiff to prove that defendant had notice of his mental incapacity at the time. The evidence on this appeal, in addition to that on the former appeal, tends to show that certain letters indicating his mental soundness, though signed by plaintiff, were written with the aid of his wife and others in view of having him continued in his occupation as defendant's conductor, but this fact was withheld from defendant; there was also evidence tending to show that defendant knew of plaintiff's nervous condition, rendering him incapable of running as conductor, eight months before he signed the release. The amount paid for plaintiff's release was about 94 per cent of the amount of his original demand for damages: *Held*, insufficient to go to the jury on the issue, and defendant's motion for judgment of nonsuit should have been granted.

CLARK, C. J., dissenting.

APPEAL from *Lyon, J.,* at February Term, 1910, of UNION.

This case was before this Court at Fall Term, 1909, and will be found reported in 151 N. C., 231, where, in the opinion of the Court, the nature of the action and much of the evidence are stated.

After the opinion of this Court was certified down, one W. H. Norwood was appointed guardian of the plaintiff, R. T. West, upon the allegation of his mental incapacity, and upon the petition of the guardian he was made a party plaintiff and permitted to prosecute this action. He filed complaint, adopting the allegation of the complaint and replication filed by the plaintiff West, and further alleged that on 29 January, 1910, he offered to return to defendant the amount of $1,511.61 (the amount paid to West by the defendant and accepted in full release of all· damages sustained by him), with interest from 9 October, 1905; that this offer was declined upon the ground that the defendant denied the mental incapacity of West at the

time the release contract was signed, and that it had any notice or knowledge thereof. It was also admitted at the trial that there was no negligence chargeable to defendant for the wreck of the passenger train on 9 September, 1904, at Whisnant's trestle, but that it was negligent in permitting a freight train to run in upon the wrecked passenger train. The issues submitted to the jury, with their findings, were as follows:

1. Did the plaintiff, at the time of receiving the voucher for $1,511.61, execute the alleged release, dated 9 October, 1905, set up in the answer? Answer: Yes.

2. Did the plaintiff, at the time of executing the said release, have sufficient mental capacity to understand the nature and effect of said release? Answer: No.

3. If not, did the defendant have notice at that time of said West's lack of mental capacity? Answer: Yes.

4. Did the plaintiff, at the time of indorsing and collecting the said voucher for $1,511.61, have sufficient mental capacity to understand the nature and effect of said voucher? Answer: No.

5. Has the said West been continuously, since 9 September, 1904, up to this time, incompetent, from want of understanding, to manage his own affairs? Answer: Yes.

6. What damage, if any, is the plaintiff, R. T. West, entitled to recover for injuries suffered by the said West as the result of the freight train running in upon the derailed passenger train, as alleged in the complaint? Answer: $8,511.61—$1,511.61= $7,000; net, $7,000.

7. Was W. H. Norwood appointed guardian of the said West, as alleged in the amended complaint filed by said Norwood? Answer: Yes.

8. Did the plaintiff Norwood, as guardian of said West, offer to return to the said defendant the money paid to the plaintiff West, with interest thereon from the time of payment, as alleged in the amended complaint filed by the said Norwood? Answer: Yes.

9. If so, did the defendant refuse to accept the return of said money? Answer: Yes.

WEST *v.* R. R.

10. Was the refusal of the defendant to accept the return of said money put upon the grounds that the defendant denied that the said West lacked mental capacity at the time he signed the said release, and received the said money? Answer: Yes.

11. Was the amount paid by the defendant to the plaintiff West a fair and reasonable compensation for the execution of said release? Answer: No.

12. Is the plaintiff's cause of action barred by the statute of limitations? Answer: No.

It will be noticed that the first, second, fourth, and sixth issues were submitted at the former trial. During the trial numerous exceptions were taken by the defendant to the rulings of his Honor in admitting incompetent testimony, excluding competent testimony, and to his refusal to give certain special instructions prayed by defendant, and to certain parts of his charge. From the judgment rendered, the defendant appealed.

*Williams & Lemmond, Tillett & Guthrie, and A. M. Stack for plaintiff.*

*Adams, Jerome & Armfield, John D. Shaw, and Burwell & Cansler for defendant.*

MANNING, J. In view of the opinion of this Court delivered in the former appeal of this case (151 N. C., 231), it is necessary, in order to sustain a recovery for the plaintiff, that an affirmative response should be made to the third issue, coupled with a negative finding to the eleventh issue. These two issues present the crucial matter of inquiry, the negligence of defendant in permitting its freight train to crash into the derailed and wrecked passenger train being admitted. This brings us to an examination of the evidence offered upon these two questions; and giving to it the most favorable construction for the plaintiff, the conclusion is irresistible that it is wholly insufficient to justify a finding upon either issue in plaintiff's favor. At best, it raises not more than a conjecture that defendant's agent making the settlement with plaintiff had notice of plaintiff's mental incapacity, assuming that such incapacity existed at that time; and it does not raise even a conjecture that the

settlement made with him was unjust, unfair, or inequitable. The plaintiff's itemized claim, as presented by him to the defendant, which was approved by those interested in his welfare, was for $1,603.22; the defendant paid him $1,511.61, the difference being less than $100, or about 6 per cent. At that time the plaintiff thought, and those interested in his welfare considered the settlement satisfactory, fair, and just. There is absolutely no evidence that defendant was striving to drive a hard bargain; no suggestion of imposition, undue influence, or fraud, except that fraud, as plaintiff contends, which arises from contracting with a mental defective with notice of his mental incapacity. It will be observed that none of the plaintiff's family or friends or his attorney thought at that time that plaintiff's mental incapacity was so great as to suggest the advisability of the appointment of a guardian for him; this seems not to have occurred to them until nearly five years thereafter and after the former opinion of this Court in this case had been certified down; at least, we find no suggestion of it in the evidence.

The narrative of the circumstances of the wreck, of the correspondence between plaintiff and defendant's agent, of what took place at the time of and just prior to the settlement, of what he said and did and what Stanley said and did, given by plaintiff himself, who was examined as a witness in his own behalf, show an intelligent comprehension of the transaction and the contract, though detailed nearly five years thereafter and by a man who was adjudged *non compos mentis* at the time he was testifying.

At the time of the settlement, 9 October, 1905, more than a year after the wreck, not only did plaintiff, but his physician and his family, entertain the opinion that plaintiff would recover, but that he had in fact so far recovered that he would be able in cold weather to resume his former position as passenger conductor. The plaintiff, in his letter of 7 October, 1905, wrote that he was then and had been since 1 October, able to resume his duty as passenger conductor; and his physician, Dr. Ashcraft, wrote on 10 October, that "So far as I can see, he (Conductor West) is in as good health as he has been for the past two or three years. I think he will come out all O. K."; and

he explained in his testimony that O. K. meant that he would be all right; that at the time he wrote the letter just quoted from, he wrote it for the purpose of informing defendant's superintendent that, in his opinion, the plaintiff was then as capable of running a train as conductor as he was before the wreck; that at that time his condition appeared normal to the outsider—the layman; and that though he had, at the time of the trial, changed his opinion, this change was largely due to the subsequent development of the plaintiff's disease. It also appeared that plaintiff went where he pleased, taking occasional trips from home unattended; that he wrote defendant to furnish him passes for these trips; that he went to Portsmouth to make the settlement unattended.

It cannot be said that, because defendant's agent, making the settlement, asked the plaintiff at that time if he knew the superintendent entertained some doubt of his fitness on account of his physical, mental, and nervous condition, to resume his duties as *passenger conductor,* that this question is sufficient to support the allegation that such agent had notice of plaintiff's want of capacity to make a contract or to make the settlement of his claim against the defendant that he did make on that day. It is a matter of common knowledge that every man with the mental capacity to make a contract has not the mental capacity to perform the many and delicate duties of a conductor of a passenger train. To make such a contract as the plaintiff made cannot be said, under the rulings of this Court and measured by the standard of capacity universally recognized, to require any great amount of mental capacity, especially in the absence of any suggestion of misrepresentation, imposition, or undue influence; while to discharge the many, varied, and delicate duties of conductor of a passenger train requires at all times more than the average intelligence, and especially a nervous condition not easily irritated or excited.

The correspondence between plaintiff and defendant's agent, in reference to the adjustment of his claim, extended over a period of more than a year, and all the letters, the same as at the former trial, were offered in evidence by one side or the

other, and their pertinency to the phase of the case now under consideration is commented upon in the former opinion of the Court.

The additional fact appearing at the last trial, that the plaintiff himself did not, in fact, compose and prepare all these letters, but was aided by his wife, his attorney and two other friends, each, in drafting the letters, can have no effect in determining the issues now under consideration, for it is not suggested that such fact was communicated to the defendant's agent having in charge the adjustment of plaintiff's claim; on the contrary, it is evident from the testimony that the purpose of plaintiff and his friends was to conceal the fact of such aid from defendant's agent. It is insisted that the conversation of Dr. Ashcraft with Superintendent Berkley in January or February, 1905, in which Dr. Ashcraft expressed the opinion that the plaintiff would not again be mentally capable of resuming his position as conductor, was notice to the defendant and must have been communicated by Superintendent Berkley to the claims agent of defendant. Assuming this, the settlement was not made until October, some nine months thereafter, and not until the claims agent was assured by Dr. Ashcraft, in his letter, that the plaintiff would be all O. K., and by plaintiff's letter that Dr. Ashcraft had so informed him. If plaintiff's family, friends, and physician believed, at that time, that plaintiff was so mentally incapacitated by the injuries received in the wreck, or from other causes, that he was rendered *non compos mentis,* it is inconceivable that they should have permitted him to go to Portsmouth alone to adjust a matter of such moment to him and to them, and without any warning to the defendant's agent of his mental condition, a condition that was not observable to the outsider or layman, to use the words of Dr. Ashcraft.

The legal principles controlling the determination of the phase of the case presented by the third and eleventh issues are stated in the former opinion of this Court and the cases therein cited. It is unnecessary to restate them. Both the sanity of the plaintiff and his apparent mental condition, and the fairness, propriety, and equitableness of the settlement of October,

1905, must be determined by conditions then existing, of which defendant's agent was fixed with notice or knowledge. This is not controverted by plaintiff's counsel in their able and well-considered brief, and such is the ruling of the Court in the former opinion. It is further sustained by the following additional authorities: *Wells v. Roger Wheel Co.* (Ky.), 114 S. W., 737; *Cleveland C. C. and St. L. Ry. Co. v. Hilligoss,* 86 N. E., 485; *Allen v. Ruland* (Conn.), 117 Am. St., 146; *Sprigg v. Sprigg's Trustee* (Ky.), 90 S. W., 985.

Having reached the conclusion that his Honor should have allowed the defendant's motion to nonsuit the plaintiff, made at the close of plaintiff's evidence and renewed at the close of all the evidence, and that his refusal to grant this motion was error, it becomes unnecessary to consider the other interesting questions presented by the other exceptions. In disallowing the motion to nonsuit, there was error, for which the judgment is reversed. The nonsuit will be entered in the court below.

Reversed.

CLARK, C. J., dissenting: This case was before the Court upon the appeal of the defendant, 151 N. C., 231. A new trial was then granted because there was no finding by the jury that the defendant company had notice of West's mental incapacity, and because there had been no return shown of the $1,500 which had been paid to him at the time he signed the release. On the trial below, held in accordance with the order of this Court, it was found by the jury, among the other issues, that the defendant company, through Stanley, its claim agent, did have notice of West's mental unsoundness; that an offer to return the amount paid under the release had been made to the defendant company, and that the offer had been refused upon the ground that the railroad company claimed that West was of sound mind at the time the release was signed; and it was further found by the jury that the settlement made by the railroad company with West was not a fair and reasonable consideration for the execution of the release.

The second trial, therefore, cured every defect that was pointed out in our former opinion. It would seem, therefore,

WEST v. R. R.

that the verdict and judgment upon this appeal should be affirmed. It is certainly too late now to say that there was no evidence, when two learned trial judges have thought that there was sufficient evidence to submit the issues and two impartial juries have found not only that there was evidence, but a preponderance of evidence sufficient to satisfy them upon each issue. It can always be argued that the jury upon the evidence should not have found the issues as they did. But that is the very matter which the jury was impaneled, as the constitutional triers of the fact, to determine. They heard the evidence, they listened to the argument of counsel that the evidence did or did not justify the finding which the contending parties sought upon the several issues. And the jury decided. This was their function. This is not a forum in which to compare and weigh the evidence and decide whether or not the jury have found correctly.

As stated in the opinion of the majority, the two crucial issues on this trial are:

3. Did the defendant have notice, at that time, of West's lack of mental capacity? Answer: Yes.

11. Was the amount paid by the defendant to the plaintiff West a fair and reasonable compensation for the execution of the said release? Answer: No.

The opinion of the Court rests upon the position that there was no evidence to sustain the finding upon said third issue. The plaintiff's counsel argued with great force that there was not only evidence to that effect, but that it was conclusive and overwhelming.

It appears in the evidence that the defendant's division superintendent, Berkley, and Dr. Blair, its surgeon, met Dr. Ashcraft at Monroe in January, 1905; that in that conversation Berkley said that while West had been prior to the accident one of the company's best conductors, since the accident he would be afraid to let him run a train for fear he would involve the railroad company in lawsuits and injure himself, and asked Dr. Ashcraft whether he thought West would ever be able to run again as conductor, to which the doctor replied that

he did not think that he would.  Dr. Ashcraft testified that he
and Superintendent Berkley were discussing West's mental con-
dition, and they agreed that on account of it he would never
be able to run again as conductor.  This knowledge of Berkley
was the knowledge of the railroad company, and was binding
upon it when its other agent, Stanley, settled with West, even if
if there had been no evidence that Berkley conveyed such infor-
mation to Stanley.  But, independently of that, there was evi-
dence to show that Berkley did in fact convey his knowledge to
Stanley.  Stanley wrote to West a letter in which he said, the
very day of the settlement: "There is some question in the
mind of the general superintendent and the superintendent of
the third division (Berkley) as to whether your physical, *men-
tal, and nervous* condition is such as to enable you to take your
old run in the passenger service."  He also wrote West: "To be
perfectly frank with you, Captain, I have been told that Dr.
Ashcraft has advised Superintendent Berkley that you are not
in a condition to go back as conductor of a passenger train."
As Dr. Ashcraft testified that he never had but one interview
with Berkley, this was certainly evidence from which the jury
could draw the conclusion that Berkley had informed Stanley
of West's defective mental condition.  The evidence shows that
at the very time Stanley was preparing the release for West's
signature the latter was in the supply department getting his
supplies to resume his run as conductor, although Stanley ad-
mits that at that very time he knew that West would not be
allowed to resume his run.  West testified that he supposed he
was signing a receipt for his pay during his lost time, and that
he did not understand that it was a receipt for damages.

The plaintiff was injured in a railroad wreck, and while im-
prisoned therein, a freight train was negligently allowed to crash
in upon the wreck in which he was imprisoned.

R. A. Morrow testified that he had known the plaintiff's
physical condition for 15 or 20 years; that prior to the acci-
dent he was all right, but ever since that date he has been inca-
pable by reason of want of understanding to manage his own
affairs and has not had sufficient mental capacity to understand
the nature and effect of the release in question.

Dr. J. M. Belk testified that he had also known him for 15 or 20 years, and that since the date of the accident, in his opinion, he has not had sufficient mental capacity to understand the effect of a contract, nor to manage his own affairs, for want of understanding.

Dr. Ashcraft testified that he was a practicing physician of 18 years' standing; was the plaintiff's family physician and formerly surgeon for the defendant; that in his opinion West has been incompetent for want of understanding, ever since the accident, to manage his own affairs, and at the time of this release he was not competent to understand its nature. He also stated the conversation with Superintendent Berkley, as above set out.

Numerous other witnesses testified to the same effect as to plaintiff's impaired mental condition ever since the wreck; among them the pastor of his church, the deputy clerk of the Superior Court, two other ministers, the editor of the town paper, several leading merchants, and many others.

In view of the overwhelming number of reputable witnesses who testify as to West's mental incapacity at the time this release was signed, and of his incapacity ever since the wreck, to transact his own business, which in fact has been carried on by others, the jury might fairly have inferred that Stanley, from observation of West's bearing at the time the release was signed, must have known thereof. In corroboration of this, Stanley testifies that he took the unusual step of having West to write at the foot of the release that he "understood" it.

In addition to all this, the company's officers must have made some inquiry, from time to time, of the condition of an old and valued servant, who had been so badly injured in the wreck, and if so, from the above concurrence of testimony of so many witnesses, the company's officers must have known his mental condition.

Add to all the above that Dr. Ashcraft testified that Superintendent Berkley and the surgeon of the road talked with him concerning West's mental condition, and they all agreed that it was defective; that Stanley wrote West that Mr. Berkley

thought that West's condition would not justify his returning
to the road; that West testified that he went to Norfolk to get
his pay for lost time, and signed the receipt for that and not
for damages, and that Stanley admits that while he was pre-
paring the papers for this release West was in the supply de-
partment getting his outfit to resume his run, though he (Stan-
ley) knew that West would not be allowed to return, and the
grossly inadequate sum paid (about one-fifth of a just compen-
sation, as both juries have found), and it would seem not only
that there was evidence to go to the jury, that the defendant
company had notice of West's mental condition, but as plain-
tiff's counsel contends, it was overwhelming and irresistible.

If juries cannot be permitted to find an issue upon such evi-
dence as this, the number of cases in which they can be per-
mitted to find the facts will be very much restricted, and their
usefulness and functions as a part of our judicial system will
be very much impaired.