CLARK, C. J., dissenting.
This case was before this Court at Fall Term, 1909, 151 N.C. 231, where, in the opinion of the Court, the nature of the action and much of the evidence are stated.
After the opinion of this Court was certified down, one W. H. Norwood was appointed guardian of the plaintiff, R. T. West, upon the allegation of his mental incapacity, and upon the petition of the guardian he was made a party plaintiff and permitted to prosecute this action. He filed complaint, adopting the allegation of the complaint and replication filed by the plaintiff West, and further alleged that on 29 January, 1910, he offered to return to defendant the amount of $1,511.61 (the amount paid to West by the defendant and accepted in full release of all damages sustained by him), with interest from 9 October, 1905; that this offer was declined upon the ground that the defendant denied the mental incapacity of West at the time the release contract (25) was signed, and that it had any notice or knowledge thereof. It was also admitted at the trial that there was no negligence chargeable to defendant for the wreck of the passenger train on 9 September, 1904, at Whisnant's trestle, but that it was negligent in permitting a freight train to run in upon the wrecked passenger train. The issues submitted to the jury, with their findings, were as follows:
1. Did the plaintiff, at the time of receiving the voucher for $1,511. 61, execute the alleged release, dated 9 October, 1905, set up in the answer? Answer: Yes. *Page 19 
2. Did the plaintiff, at the time of executing the said release, have sufficient mental capacity to understand the nature and effect of said release? Answer: No.
3. If not, did the defendant have notice at that time of said West's lack of mental capacity? Answer: Yes.
4. Did the plaintiff, at the time of indorsing and collecting the said voucher for $1,511.61, have sufficient mental capacity to understand the nature and effect of said voucher? Answer: No.
5. Has the said West been continuously, since 9 September, 1904, up to this time, incompetent, from want of understanding, to manage his own affairs? Answer: Yes.
6. What damage, if any, is the plaintiff, R. T. West, entitled to recover for injuries suffered by the said West as the result of the freight train running in upon the derailed passenger train, as alleged in the complaint? Answer: $8,511.61 — $1,511.61 = $7,000; net, $7,000.
7. Was W. H. Norwood appointed guardian of the said West, as alleged in the amended complaint filed by said Norwood? Answer: Yes.
8. Did the plaintiff Norwood, as guardian of said West, offer to return to the said defendant the money paid to the plaintiff West, with interest thereon from the time of payment, as alleged in the amended complaint filed by the said Norwood? Answer: Yes.
9. If so, did the defendant refuse to accept the return of said money? Answer: Yes.
10. Was the refusal of the defendant to accept the return of (26) said money put upon the grounds that the defendant denied that the said West lacked mental capacity at the time he signed the said release, and received the said money? Answer: Yes.
11. Was the amount paid by the defendant to the plaintiff West a fair and reasonable compensation for the execution of said release? Answer: No.
12. Is the plaintiff's cause of action barred by the statute of limitations? Answer: No.
It will be noticed that the first, second, fourth, and sixth issues were submitted at the former trial. During the trial numerous exceptions were taken by the defendant to the rulings of his Honor in admitting incompetent testimony, excluding competent testimony, and to his refusal to give certain special instructions prayed by defendant, and to certain parts of his charge. From the judgment rendered, the defendant appealed.
In view of the opinion of this Court delivered in the former appeal of this case (151 N.C. 231), it is necessary, in order to sustain a recovery for the plaintiff, that an affirmative response should be made to the third issue, coupled with a negative finding to the eleventh issue. These two issues present the crucial matter of inquiry, the negligence of defendant in permitting its freight train to crash into the derailed and wrecked passenger train being admitted. This brings us to an examination of the evidence offered upon these two questions; and giving to it the most favorable construction for the plaintiff, the conclusion is irresistible that it is wholly insufficient to justify a finding upon either issue in plaintiff's favor. At best, it raises not more than a conjecture that defendant's agent making the settlement with plaintiff had notice of plaintiff's mental incapacity, assuming that such incapacity existed at that time; and it does not raise even a (27) conjecture that the settlement made with him was unjust, unfair, or inequitable. The plaintiff's itemized claim, as presented by him to the defendant, which was approved by those interested in his welfare, was for $1,603.22; the defendant paid him $1,511.61, the difference being less than $100, or about 6 per cent. At that time the plaintiff thought, and those interested in his welfare considered the settlement satisfactory, fair and just. There is absolutely no evidence that defendant was striving to drive a hard bargain; no suggestion of imposition, undue influence, or fraud, except that fraud, as plaintiff contends, which arises from contracting with a mental defective with notice of his mental incapacity. It will be observed that none of the plaintiff's family or friends or his attorney thought at the time that plaintiff's mental incapacity was so great as to suggest the advisability of the appointment of a guardian for him; this seems not to have occurred to them until nearly five years thereafter and after the former opinion of this Court in this case had been certified down; at least, we find no suggestion of it in the evidence.
The narrative of the circumstances of the wreck, of the correspondence between plaintiff and defendant's agent, of what took place at the time of and just prior to the settlement, of what he said and did and what Stanley said and did, given by plaintiff himself, who was examined as a witness in his behalf, show an intelligent comprehension of the transaction and the contract, though detailed nearly five years thereafter and by a man who was adjudged non compos mentis at the time he was testifying.
At the time of the settlement, 9 October, 1905, more than a year after the wreck, not only did plaintiff, but his physician and his family, entertain the opinion that plaintiff would recover, but that he had in fact so far recovered that he would be able in cold weather to resume his former position as passenger conductor. The plaintiff, in his letter of 7 *Page 21 
October, 1905, wrote that he was then and had been since 1 October, able to resume his duty as passenger conductor; and his physician, Dr. Ashcraft, wrote on 10 October, that "So far as I can see, he (Conductor West) is in as good health as he has been for the past two or three years. I think he will come out all O. K."; and he explained in his testimony that O. K. meant that he would be all right; that at the time he wrote the letter just quoted from, he wrote it for the purpose of (28) informing defendant's superintendent that, in his opinion, the plaintiff was then as capable of running a train as conductor as he was before the wreck; that at that time his condition appeared normal to the outsider — the layman; and that though he had, at the time of the trial, changed his opinion, this change was largely due to the subsequent development of the plaintiff's disease. It also appeared that plaintiff went where he pleased, taking occasional trips from home unattended; that he wrote defendant to furnish him passes for these trips; that he went to Portsmouth to make the settlement unattended.
It cannot be said that, because defendant's agent, making the settlement, asked the plaintiff at that time if he knew the superintendent entertained some doubt of his fitness on account of his physical, mental, and nervous condition, to resume his duties as passenger conductor, that this question is sufficient to support the allegation that such agent had notice of plaintiff's want of capacity to make a contract or to make the settlement of his claim against the defendant that he did make on that day. It is a matter of common knowledge that every man with the mental capacity to make a contract has not the mental capacity to perform the many and delicate duties of a conductor of a passenger train. To make such a contract as the plaintiff made cannot be said, under the rulings of this Court and measured by the standard of capacity universally recognized, to require any great amount of mental capacity, especially in the absence of any suggestion of misrepresentation, imposition, or undue influence; while to discharge the many, varied, and delicate duties of conductor of a passenger train requires at all times more than the average intelligence, and especially a nervous condition not easily irritated or excited.
The correspondence between plaintiff and defendant's agent, in reference to the adjustment of his claim, extended over a period of more than a year, and all the letters, the same as at the former trial, were offered in evidence by one side or the other, and their pertinency to the phase of the case now under consideration is commented upon in (29) the former opinion of the Court.
The additional fact appearing at the last trial, that the plaintiff himself did not, in fact, compose and prepare all these letters, but was aided by his wife, his attorney and two other friends, each, in drafting *Page 22 
the letters, can have no effect in determining the issues now under consideration, for it is not suggested that such fact was communicated to the defendant's agent having in charge the adjustment of plaintiff's claim; on the contrary, it is evident from the testimony that the purpose of plaintiff and his friends was to conceal the fact of such aid from defendant's agent. It is insisted that the conversation of Dr. Ashcraft with Superintendent Berkley in January or February, 1905, in which Dr. Ashcraft expressed the opinion that the plaintiff would not again be mentally capable of resuming his position as conductor, was notice to the defendant and must have been communicated by Superintendent Berkley to the claims agent of defendant. Assuming this, the settlement was not made until October, some nine months thereafter, and not until the claims agent was assured by Dr. Ashcraft, in his letter, that the plaintiff would be all O. K., and by plaintiff's letter, that Dr. Ashcraft had so informed him. If plaintiff's family, friends, and physician believed, at that time, that plaintiff was so mentally incapacitated by the injuries received in the wreck, or from other causes, that he was rendered non composmentis, it is inconceivable that they should have permitted him to go to Portsmouth alone to adjust a matter of such moment to him and to them, and without any warning to the defendant's agent of his mental condition, a condition that was not observable to the outsider or layman, to use the words of Dr. Ashcraft.
The legal principles controlling the determination of the phase of the case presented by the third and eleventh issues are stated in the former opinion of this Court and the cases therein cited. It is unnecessary to restate them. Both the sanity of the plaintiff and his apparent mental condition, and the fairness, propriety and equitableness of the settlement of October, 1905, must be determined by conditions then existing, (30) of which defendant's agent was fixed with notice or knowledge. This is not controverted by plaintiff's counsel in their able and well-considered brief, and such is the ruling of the Court in the former opinion. It is further sustained by the following additional authorities: Wells v. Roger Wheel Co. (Ky.), not reported in St. Rep.; R.R. v. Hilligoss, 171 Ind. 417; Allen v. Ruland (Conn.), 117 Am. St., 146;Sprigg v. Sprigg's Trustee (Ky.), not reported.
Having reached the conclusion that his Honor should have allowed the defendant's motion to nonsuit the plaintiff, made at the close of plaintiff's evidence and renewed at the close of all the evidence, and that his refusal to grant this motion was error, it becomes unnecessary to consider the other interesting questions presented by the other exceptions. In disallowing the motion to nonsuit, there was error, for which the judgment is reversed. The nonsuit will be entered in the court below.
Reversed. *Page 23