[No. 12964. *En Banc.* November 10, 1916.]

ERNEST NAPOLEON ROBERTS, *Respondent*, v. PACIFIC TELEPHONE & TELEGRAPH COMPANY, *Appellant.*[1]

LIMITATION OF ACTIONS — RUNNING OF STATUTE — INSANITY OF PLAINTIFF—BURDEN OF PROOF. In an action for personal injuries, in order to toll the statute of limitations by reason of insanity, the burden of proof is upon the plaintiff to show by clear and convincing evidence that on the day he received his injuries, he became and was insane and incapable of transacting ordinary business and that the condition continued for the period necessary to toll the statute.

DAMAGES—ACTIONS—INSTRUCTIONS—INSANITY OF PLAINTIFF. In an action for personal injuries alleged to have caused plaintiff's temporary insanity, brought by him as a competent person in his own name, the jury should be instructed that they cannot find the plaintiff now insane, when, from his testimony, the jury might have found him insane at the time of the trial and thus enhanced his damages.

SAME. In such a case, it is error to instruct that insanity once established is presumed to continue until the contrary is shown, where that was contrary to the allegation of the complaint and would permit plaintiff to begin an action as a sane man and recover damages on the ground that he was insane.

SAME—EVIDENCE—INSANITY—COMMITMENT. Upon an issue as to plaintiff's temporary insanity caused by injuries, his commitment to the state insane asylum, conformable to Rem. 1915 Code, § 5953, is admissible in evidence as to his insanity at that time.

SAME—INSTRUCTIONS—INSANITY. In such case, an instruction as to the presumption of the continuance of insanity should be limited to the period of his confinement therefor, and the jury should be told that the commitment papers were not conclusive long prior to the time of the commitment.

[1]Reported in 160 Pac. 965.

LIMITATION OF ACTIONS — RUNNING OF STATUTES — INSANITY OF PLAINTIFF—BURDEN OF PROOF—INSTRUCTIONS. In an action for personal injuries, in which the plaintiff sought to toll the statute of limitations by reason of insanity caused by the injuries, the jury are properly instructed that, if the plaintiff has established insanity of a fixed and settled nature at a certain time by a preponderance of clear and convincing evidence, the condition is presumed to continue, and the burden would be upon the defendant to establish his subsequent sanity, so that he was able to know and comprehend the nature of his acts and able to transact and understand ordinary business.

RELEASE—AVOIDANCE—INSANITY—INSTRUCTIONS. Upon an issue as to plaintiff's insanity at the time of signing a release of damages, an instruction that his mental incapacity must be established by clear and convincing evidence need not be accompanied by the further condition "that defendant had at such time knowledge or notice of such fact"; since, if his lack of capacity was so great as to render him incapable of understanding the effect of the release, or if his mental incapacity did not go to that extent, the defendant had notice of his mental condition when it procured the release.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for $24,000 for personal injuries is so excessive as to indicate the influence of passion and prejudice, where plaintiff, 28 or 29 years of age, had the small bones of his hand broken, and received a gash over his eye, some injury to his ankles and knees of a temporary nature, and to the back of his head, impairment of eyesight, and temporary mental derangement, but was able to work at his usual wages in less than two months.

MORRIS, C. J., MOUNT, and MAIN, JJ., dissent in part.
FULLERTON, J., dissents.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered January 20, 1915, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a lineman through the breaking of a telephone pole. Reversed.

*Post, Avery & Higgins*, for appellant.

*Robertson & Miller* and *E. W. Robertson*, for respondent.

HOLCOMB, J.—Respondent was a lineman working for appellant near Pomeroy, Washington, in reconstruction of a telephone line. A pole which he had climbed broke and re-

spondent fell with the pole, the cross-arm at the top pinning his head to the ground and knocking him unconscious for a short time. Some of the bones in his left hand were broken, his ankles were hurt, there was a cut over his eye, the back of his head was bruised and swollen, and his eye was bloodshot. The accident happened September 15, 1910. Suit was brought January 12, 1914, or approximately four months after the expiration of the period of the statute of limitations. Various grounds of negligence are alleged in the complaint, but the ground relied upon by respondent was that, at the direction of the foreman of construction, another lineman cut the wires upon a near-by pole, and that such wire cutting caused the pole upon which respondent stood to break and fall. The complaint alleges that the plaintiff became and was insane continuously from the time of the injury until in September, 1913, and that he had been an inmate of the asylum for insane at Steilacoom for about four months. It is not contended in the complaint that the respondent was insane at the time of the commencement of the action, and there was no guardian *ad litem* appointed to sue for him.

Appellant, in its answer, admits that the respondent was in the employ of appellant, denies all allegations of negligence, and affirmatively alleges the following: (1) That, on December 12, 1910, or three months after the accident, plaintiff settled, satisfied, and released all claims and demands arising out of the accident, for the sum of $135 then paid to him; (2) that the action was commenced more than three years after the cause of action accrued and is barred by the statute of limitations; (3) that there was contributory negligence and fault on the part of the respondent; (4) that the respondent assumed the risk; (5) that the injury was caused by the negligence of a fellow servant. Respondent in reply alleges in respect to the release that, at the time of executing it, he was incapable of transacting business or knowing the effect of such an instrument because of his weakened mental condition, and that the instrument was obtained from him

fraudulently and without consideration; and further alleges that he was insane continuously from the time of the accident until September, 1913.

Twenty-eight errors are assigned by appellant, and the printed abstract of the record comprises 752 pages. The errors assigned, however, invoke principally, and this opinion will deal only with, the questions of the running of the statute of limitations, of the validity of the release, of the refusing and giving of instructions to the jury, and of the excessiveness of the verdict. There was a verdict for respondent for the sum of $24,000. Appellant unsuccessfully moved for a directed verdict in its favor, for judgment notwithstanding the verdict, and for a new trial.

As the action was not brought until January 12, 1914, the injury having occurred September 15, 1910, and approximately four months more than the period of the statute of limitations of such actions had run, and as the release is claimed to have been executed on December 12, 1910, within three months after the accident, it is unnecessary to discuss separately the question of the validity of the release and the tolling of the statute of limitations. They are co-ordinate and co-related. If respondent was insane for a period of time sufficient to toll the statute of limitations to within three years of the commencement of the suit, then the period of his insanity would cover the time of the execution of the release so that the same would not be binding upon respondent. And, conversely, if he was lucid and mentally competent at any time to transact ordinary business, the statutory period must start running from that time.

The court submitted to the jury three special interrogatories, the first of which was as to whether plaintiff executed the contract of settlement and release in question, to which the jury answered, "Yes." The second interrogatory was: "If you answer the first question 'Yes,' did the plaintiff at the time of signing the same possess sufficient understanding

to know the nature and effect of said release?" to which the
jury answered, "No." The third interrogatory was, "Was
there any time after September 15, 1910, and before Janu-
ary 12, 1911, when the plaintiff was mentally capable of
transacting any ordinary business?" to which the jury an-
swered, "No."

The trial court correctly instructed the jury, in instruc-
tion five, that the burden of proof would be upon the plain-
tiff to show by clear and convincing evidence that, upon the
day when the alleged injuries were sustained, plaintiff be-
came and was insane and that he was incapable of transact-
ing ordinary business, and that this condition of mind con-
tinued for a period of four months or until the 14th day of
January, 1911.

The only testimony in behalf of respondent describing
the condition of respondent immediately after the injury on
September 15, 1910, was that of his brother James Roberts
who was also a lineman working at the same place and time,
who testified that, when respondent was placed in an automo-
bile to be taken to Pomeroy for medical attention, respond-
ent seemed to think he was having a joy ride. On the fol-
lowing night the witness went to Pomeroy and respondent
looked distant and didn't want to recognize him. Respondent
didn't sleep and wouldn't let the witness sleep. Respondent
stated that people were going to hang him. Woke witness
and told him that somebody had gotten him out in the street
and wanted to whip him, and wanted witness to go out in the
street with him. Witness did so and found no one. Respond-
ent kept continually awaking witness. When respondent was
brought out to the camp again he made threats to attack
the witness, constantly quarreling with him, although he had
never been quarrelsome before; that respondent's mind seemed
blank; he was just crazy; he didn't know what he was doing.

Respondent himself testified that the first thing he remem-
bered after the pole fell was his being in the asylum in Steil-
acoom in 1913. He did not recollect any event or occurrence

between the date of the accident and his partial recovery at the asylum. He testified that he heard noises in his head and heard voices; that he sometimes heard a bell at a distance and saw objects; that he heard people coming in the house when no one was there; that he remembered only the last week in the asylum, although he testified to hearing people laugh at him while there. These were interested witnesses. Appellant introduced apparently disinterested witnesses, two farmers who happened to come along in their automobile shortly after the accident and conveyed the respondent to Pomeroy to the doctor's office and conversed with him about the accident and other matters, who considered him rational and sane. Other witnesses, who were employed by appellant at the time, observed his manner and appearance while at Pomeroy and immediately after returning to camp after being in Pomeroy, under the doctor's care for a few days, and saw nothing wrong with his mental condition. There was testimony in his behalf by his relatives and neighbors describing his acts, manner and conduct afterwards. Experts for respondent testified upon the hypothesis of the truth of facts related by other witnesses that he was insane. Experts for appellant testified that, from examination and observation of respondent, he was not insane but was feigning and simulating insanity. All this, however, furnishes only a conflict in the testimony, all of which went to the jury and upon all of which the jury passed. It is undoubtedly the rule that the showing as to such a condition, in order to avoid the running of the statute of limitations and to avoid the validity of the release in question, should be clear and convincing. There are other and much more remarkable features in the case which tend to cast very grave doubt upon the truthfulness of respondent's showing as to his condition during that time. After returning to Spokane on the 30th day of September or the 1st day of October, 1910, he went to the house of his sister, a Mrs. Talbott, and remained there for a short time, after which he went with his sister and her husband,

Ed Talbott, to the ranch of the Talbotts near Plummer, Idaho. While in Spokane he wrote the following letter:

"Mr. Thos. H. Elson, District Supt. of Plant, 508 Fraternal Bldg., Spokane.   Oct. 9, 1910.

"Dear Sir:   While in the employ of P. T. & T. Co. under Foreman McDonald at Pomeroy, Wn., was injured first part of Sept. by pole breaking off at top of ground when wires were off of pole ahead of me; the pole I was on snapped throwing me to the ground, cutting large gash over left eye, breaking small bones in left hand; I sprained both of my ankles; they took me to Pomeroy in an automobile and put me under doctor's care where they left me five days then went back to camp, where I stayed ten days with the understanding that my time was to go on until I was able to go to work; came to my sister's in Spokane, 29th day of Sept. and have been with her ever since; they have pay me up until 28th of Sept., when left; can get you doctor's certificate as to my present condition or let the company's doctors examine me; am willing at any time it may be convenient to you; now Mr. Elson I don't want to have any trouble about this matter but I want what is right and justly my due, and I trust that you will, after making investigation and finding I have not misstated facts, see fit to continue me on pay roll until I am in condition to go to work, as my head has bothered me all the time but can not tell what will turn up, but wish to do the right thing, but if can not agree will see attorneys and see what I can do that way.   Trusting to hear from you soon, I remain,

"Most respectfully,
"(Signed) E. N. Roberts, Plummer, Idaho."

It will be observed that this letter shows coherence and continuity of thought and reason, clearness of memory, and decisiveness of judgment.   On November 11, 1910, respondent wrote another letter to the appellant which was equally intelligent, definite, decisive, and coherent, and in which he mentioned the time and place of the accident, the name of the foreman of the construction crew, and the name of the physician at Pomeroy who attended him, and requested that his claim be given attention.   On about December 1, 1910, respondent and two of his brothers, one of whom was a line-

man and the other a groundman working for the appellant, went to work for the appellant at Orondo, near Wenatchee. Respondent worked until December 12, 1910, when he came to Spokane at the request of an officer of the appellant who was looking after the claims against the appellant, and after some negotiations, he there made the settlement and signed the release before Mr. Higgins, in the office of appellant's counsel, receiving a check for $135. Previous to this settlement he had received two other checks, one for pay up to the time of the injury, and one for pay up to the time he left camp after the injury, he having been kept on the pay roll until he left camp about the 1st of October, 1910. All of these checks he indorsed and cashed. After this settlement, appellant had no further knowledge of him until in February, 1912, when it received a letter from him written at Golden, Colorado. This letter was addressed to H. J. Tinkham, district superintendent of plant, and it also was a clear, intelligent, rational letter, stating that he had been unable to work since he worked for the company; that he had a doctor bill against him on account of his eye that was injured in the accident at Pomeroy, and would like to know if the company could not do something more for him; that all he wished was that his doctor bill be paid, and that he would give the address of his doctor or have him write the company as quick as he received answer to his (respondent's) letter. He stated also that he would like to have recommendation so he could go to work as quick as able; that he had no funds and he would like for the superintendent to give him a little consideration; signing his name E. N. Roberts, and giving his address as Box 623, Golden, Colo.

The Talbotts, his sister and brother-in-law, testified that they did not call in a physician for respondent while he was in Spokane in October, 1910, nor after they went to the ranch in 1911, or any other time. Mrs. Talbott testified that she did not know of plaintiff's writing any letters to the company or anybody connected with the company, in October,

November, or December, 1910, or any other time. She was shown the letter of October 9, 1910, and denied knowledge of its being either respondent's handwriting or his signature. She was shown the second letter, dated November 11, 1910, and stated that she did not see him write the letter and did not know whether it was respondent's handwriting or signature. She was shown the letter of February, 1912, written and mailed from Golden, Colorado, and denied any knowledge as to whether or not it was respondent's handwriting. Respondent himself denied that he knew whether or not it was his writing in any of the letters; that he did not remember of being in Golden, Colorado, in 1912. He admitted that the handwriting of the letter ostensibly written there looked like his, but said he did not know his handwriting. It is unquestionably written by the same hand that wrote the other two letters, which his relatives testified were copied by him in his own handwriting. It is also manifestly written by the same hand that indorsed the several pay checks and signed the release.

After the close of appellant's testimony, Mr. and Mrs. Talbott were recalled on rebuttal, and contradicted their previous testimony by testifying that Talbott, at the instance of his wife, drafted the letter of October 9, 1910, in their apartment in Spokane, and instructed respondent to copy it, and that respondent sat at a table across from Talbott and, without further assistance, instruction, or direction, copied the letter and Talbott mailed it; that as to the letter of November 11, Talbott drafted that letter and sent it to his wife to have her cause respondent to copy it at their ranch in Idaho. Mrs. Talbott testified to the same effect. It is peculiar as to the facts detailed in the first letter that James Roberts, brother of respondent, had not been in Spokane after the accident happened to respondent, and himself testified that he never saw his brother after he left the camp near Pomeroy until he saw him up at the ranch near Plummer, Idaho, in November, though Mrs. Talbott, his sister, testified

that he had visited her house before the first letter was written. Where the Talbotts obtained the facts stated in the first letter, which goes into detail as to what happened to the respondent at the time of the injury and afterwards, is incomprehensible. No attempt, other than respondent's denial of recollection of it, was made to explain the writing of the letter from Golden, Colorado. It was written after the termination of the four months' period following the injury necessary to toll the statute of limitations. Even the copying of the first two letters, unassisted, as was testified to by the Talbotts, would seem an impossible accomplishment for a man who, as he claimed at the trial, had forgotten how to write as he was formerly able, and could only remember how to write *or read* very slightly. If these letters emanated from the mind of respondent, he was beyond question of sufficient sanity at any one of those times to transact ordinary business, which is the test of his competency. The letter from Golden, Colorado, of February, 1912, is unexplained except by himself in his testimony that he did not recollect of having written it and did not recognize the writing. If this letter emanated from his mind, he was beyond question at the time of sufficient sanity to know and understand his ordinary business affairs. Such being the case, it would indicate very strongly to a fair mind that he had been in the same condition of sanity previously, or at least that he had lucid intervals. Yet the jury, who were the triers of the facts, seem to have accepted his version of the writing of these letters and to have found in his favor upon all the issues of fact connected therewith.

In the fall of 1912, he again worked for appellant, assisting a crew of line repairers for a few weeks near Lind, Washington, with apparent ability to perform the duties. On May 12, 1913, in Seattle, he was placed in jail for something and was found there by his brother-in-law, Talbott, who swore to a complaint of insanity against him. An inquiry was had, and on that day he was committed to the asylum

for insane at Steilacoom. On August 4, 1913, a little less than three months afterwards, he was discharged therefrom as cured. In the record made by the physicians who examined him, it appeared that there was testimony that there was insanity or tendency to insanity in the family of respondent, a brother having been subject to epilepsy. Appellant requested the court to instruct the jury as follows:

"I charge you, as a matter of law, that, under the allegations of the complaint, you cannot find that the plaintiff is now insane or has been insane at any time since he left Steilacoom asylum, if you find he was ever in such asylum."

This request was refused, to which exception was duly taken. Since the complaint alleges, "that by reason of said injuries plaintiff's mind was affected and plaintiff became and was insane continuously from said time until his discharge from the asylum as hereinafter alleged," and since plaintiff brought his suit as a competent person in his own name, this instruction, or one covering the matter in substance, should have been given. It was proper to be given for the reason that the jury might have considered respondent insane at the time of the trial, from his testimony and that of others, and thus enhanced the damages awarded. The point is not covered by any instruction given by the court.

Appellant further requested the court to instruct the jury as follows:

"If you find from the evidence in this case that the plaintiff was, at any time in the year 1913, in Steilacoom asylum, I charge you that such fact shall not be considered by you in determining whether or not the plaintiff was to any extent mentally deranged in the years 1910, 1911, or 1912. You shall not allow the fact that plaintiff was in Steilacoom asylum at any time during the year 1913, if you find it to be a fact, to influence your minds in any manner whatsoever in determining the mental condition or capacity of the plaintiff in 1910, 1911, or 1912. I also charge you that the physicians' certificate or the answers to questions contained therein dated at Seattle in May, 1913, shall not be considered by you as evidence of any fact in issue in this case."

The court instructed the jury on this subject as follows:

"If insanity has once been established, then the presumption is that insanity continues until the contrary is established by the preponderance of the evidence."

This instruction is proper where the allegation and the facts under the allegation show that the insanity is continuous and existing.  But in this case the allegation was that the respondent was insane continuously until his discharge from the asylum.  Respondent argues, however, that the complaint further alleged that, since the time of the injury, plaintiff's physical and mental vigor has been destroyed by reason of said injuries, and he has been unable to do any work of any kind; that he will continue to suffer during the remainder of his life great physical and mental pain.  These allegations are inconsistent and, under the instruction given by the court, would permit respondent to bring and maintain his action as a sane man and recover damages on the ground that he was insane.

It is contended by appellant that the introduction of the commitment papers in the insanity proceeding, which was excepted to, was erroneous.  We think not.  The proceedings were conformable to the law in such cases (Rem. 1915 Code, § 5953), and were a valid adjudication of his competency at that time.  The commitment papers were competent to show the existence of insanity in 1913 from May 12 or thereabouts to August 4, and also the discharge of respondent as cured.  Prior to the inquisition and adjudication of his insanity, the presumption was that he was sane up to the time prior thereto when he was shown to have become insane.  The commitment papers include the physicians' certificate and the answers to questions contained therein under their examination, and these were competent as tending to show upon what the physicians based their certificate.  All of it was for the jury to weigh.  Although it was *ex parte*, it was all competent as going to the question of insanity at that time, but not at any other time.  *Giles v. Hodge*, 74 Wis. 360, 43 N. W. 163;

*State v. Austin*, 71 Ohio St. 317, 73 N. E. 218, 104 Am. St.
778; *Branstrator v. Crow*, 162 Ind. 362, 69 N. E. 668; *Cal-
umet Elec. St. R. Co. v. Mabie*, 66 Ill. App. 235; *State v.
Welty*, 65 Wash. 244, 118 Pac. 9; 16 Am. & Eng. Ency. Law
(2d ed.), 606. The concluding sentence of the requested in-
struction was, therefore, erroneous as framed and should have
further limited the inquiry to the period of established insan-
ity. The jury should have been instructed, in effect, as re-
quested, that the showing made to the examining physicians
in May, 1912, was not conclusive as to insanity long prior
thereto, or, dating as far back as September, 1910, of chronic
or permanent insanity.

Appellant requested an instruction as to the effect of the
statute of limitations, to the effect that, if there were any
lucid interval in the mind of respondent at any time after the
injury and at least up to January 12, 1911, during which
lucid interval respondent was mentally capable of transacting
any business, then the action would be barred under the stat-
ute and he could not recover any sum whatever; and to the
further effect that the burden of proof is not on the defend-
ant to show such mental capacity at any time during such
period up to January 12, 1911, but upon the plaintiff to
show such mental derangement or incapacity at all times
from and including September 16, 1910, to January 11, 1911,
and to establish the same not only by a preponderance of
evidence, but also by evidence clear and convincing. Instead
thereof the court gave instruction numbered five, a part of
which has been hereinbefore quoted, as to the effect of the
statute of limitations and the degree of proof required on
behalf of respondent to avoid the operation of the statute,
and continued as follows:

"A person is presumed to be sane until he is proved to
be otherwise, and that the burden is upon the person claiming
insanity to prove it by clear and convincing evidence; but
that when insanity of a fixed and settled nature is once estab-
lished by such evidence, it is presumed to continue until it

is overturned by proof of sanity. You are, therefore, instructed that, if plaintiff established that he became and was insane on the day of the alleged injury, and such insanity was of a fixed and settled nature, it would be presumed that he continued insane until proven to be sane, and the burden would be upon the defendant to establish his subsequent sanity. Even though the plaintiff may have been insane on the day when injured, if it were established that he became and was sane on any subsequent day prior to January 14, 1911, then this action would be barred by the statute of limitations."

This was consistent and it instructed the jury that, if it was established that, at any time, plaintiff had been sane prior to January 14, 1911, the action would be barred. The difference in dates of two days is not erroneous and, as suit was brought on January 12, 1914, and four calendar months after September 15, 1910, would end on January 14, 1911, the time calculation of his Honor was correct. The advice to the jury that "when insanity *of a fixed and settled nature* is once established by plaintiff by a preponderance of evidence and evidence that is clear and convincing . . . it would be presumed that he continued insane until proven to be sane, and the burden would be upon the defendant to establish his subsequent sanity," is also a correct statement of the law. 16 Am. & Eng. Ency. Law (2d ed.), 604; *Rogers v. Walker*, 6 Pa. St. 371, 47 Am. Dec. 470; *Gingrich v. Rogers*, 69 Neb. 527, 96 N. W. 156; *In re Brown*, 39 Wash. 160, 81 Pac. 552, 109 Am. St. 868, 1 L. R. A. (N. S.) 540; *State ex rel. Thompson v. Snell*, 46 Wash. 327, 89 Pac. 931, 9 L. R. A. (N. S.) 1191.

If insanity *of a fixed and settled nature* is once shown to exist in the actor, at a certain time, by evidence that is clear and convincing, it must be presumed to continue until a contrary state of sanity is made to appear by the adverse party. In the first place, the presumption of sanity has been overcome and insanity established by evidence clear and convincing. Undoubtedly the only correct rule would be that that

condition of insanity once established must be overcome, if at all, by the adverse party assuming the burden of showing that, at any subsequent time, the actor became and was sane. And rational conduct, rational acts, and business transactions at a given time may be shown to establish lucidity at such time, and if satisfactorily shown, are as cogent to establish such lucid periods as proof of habits, acts, and conduct of an irrational nature are to show insanity. It should be borne in mind that the only test is that, at such times, the actor was able to know and comprehend the nature and effect of his acts, and was therefore able to transact with understanding ordinary business; and that by a lucid interval is meant "not merely a cessation of the violent symptoms of the disorder, but a temporary restoration of reason such as to create responsibility for acts done during its continuance; restoration of the mental faculties to their original condition is not necessary; it is sufficient if there be such restoration that the person is able, beyond doubt, to comprehend and to do the act with such reason, memory, and judgment as to make it a legal act." 16 Am. & Eng. Ency. Law (2d ed.), 565.

These last principles were not requested by appellant to be given the jury for their guidance, inasmuch, probably, as it was its contention that respondent was at all times sane during the issuable period. The instruction given by his Honor, so far as it went, and in the absence of further request, was correct.

Upon the question of negligence and assumed risk, we think the court correctly instructed the jury under the facts. Those questions were properly submitted to the jury for their solution. There was evidence on behalf of respondent tending to show negligence, and his contributory fault or assumption of risk was a question of fact for the jury under proper instructions. We have examined the instructions in relation thereto and consider them proper.

We do not agree that appellant was entitled to its requested instruction on the subject of avoiding the release. The substance and effect of the requested instruction, somewhat abridged, was given by his Honor in another instruction (No. 12), but a phase of the one prayed, to the effect that not only the mental incapacity of plaintiff at the time must have been established by clear and convincing evidence (as was instructed), but also "that defendant had at such time knowledge or notice of such fact," was omitted, of which complaint is made. We do not concur with the rule laid down in *West v. Seaboard Air Line R. Co.*, 151 N. C. 231, 65 S. E. 979; *Id.*, 154 N. C. 24, 69 S. E. 676, and cases therein cited. We agree rather with the principle as stated in *Cooney v. Lincoln*, 21 R. I. 246, 42 Atl. 867, 79 Am. St. 799, as more just, to this effect: That if the plaintiff's lack of capacity at the time of making the release was so great as to render him incapable of understanding the effect of the instrument, or if his mental incapacity did not go to that extent, defendant had notice of his mental condition when it procured the release. See, also, *Rhoades v. Fuller*, 139 Mo. 179, 40 S. W. 760; *Orr v. Equitable Mtg. Co.*, 107 Ga. 499, 33 S. E. 708; *Bunn v. Postell*, 107 Ga. 490, 33 S. E. 707.

We consider the verdict, however, as grossly excessive and as necessarily given under the influence of passion and prejudice. Respondent was able to work at his usual wages in December, 1910, less than two months after his injury. He was twenty-eight or twenty-nine years of age. The permanent injuries which respondent under his evidence showed were an injured hand, some of the small bones of the left hand having been broken, a large gash over his left eye without any evidence of a broken bone, some injury to his ankles and knees of a temporary nature, an injury in the back of his head, and some impairment of sight in one eye, largely remediable by the use of proper glasses, and the possible, slight, temporary mental derangement, which became cured

in August, 1913, do not justify any such recovery as $24,000. It is unconscionable to the extent of more than half that sum.

Upon the whole case, for the errors in giving and refusing instructions and the excessiveness of the verdict, we are of the opinion that appellant did not have a fair trial, and that a new trial should be granted.

Reversed and remanded.

PARKER, ELLIS, and CHADWICK, JJ., concur.

MOUNT, J. (dissenting)—The trial court should have directed a verdict for the defendant, because upon the whole evidence there can be no doubt that the plaintiff was perfectly sane when he executed the release. The testimony to the contrary, discredited as it was, is unworthy of serious consideration.

I concur upon the other points decided.

MORRIS, C. J., and MAIN, J., concur with MOUNT, J.

FULLERTON, J. (dissenting)—The questions of fact were for the jury. There was no error in the instructions. I am of the opinion, however, that the verdict was excessive, but the remedy for this is leave to take judgment for a lesser sum, not a reversal *in toto*. I therefore dissent from the judgment ordered.