[No. 28512. Department Two. January 2, 1942.]

MARIE A. PAGE, *as Executrix and Individually, Respondent,* v. PRUDENTIAL LIFE INSURANCE COMPANY OF AMERICA, *Appellant.*[1]

[1]Reported in 120 P. (2d) 527.

 

*Cannon, McKevitt & Fraser (Joseph L. Thomas,* of counsel), for appellant.

*Brown & Huneke,* for respondent.

SIMPSON, J.—This action was instituted by plaintiff, Marie A. Page, individually and as executrix of the estate of Winfield H. Page, deceased, to collect on two life insurance policies issued to Winfield H. Page by defendant.

Plaintiff alleged that February 6, 1922, defendant issued two life insurance policies to Winfield H. Page, who died November 29, 1939; that the policies were in full force; and that defendant refused to pay them. Defendant admitted issuing the policies, but as an affirmative defense alleged that insured cash surrendered the policies May, 1938. By reply, plaintiff admitted the cash surrender, the receipt of defendant's check in payment thereof, and the indorsement and collection by Winfield H. Page. For affirmative defenses to the answer, plaintiff alleged that, during the month of May, 1938, and for many years prior thereto, Winfield H. Page was totally disabled and not mentally competent to make any contracts, all of which was known to defendant, who acted secretly and in bad faith in accepting the policies.

The cause, tried to the court sitting without a jury, resulted in the entry of judgment for plaintiff in the total sum of $519.03. Defendant appeals.

The assignments of error which we feel it is necessary to consider are in overruling appellant's general objection to the introduction of evidence touching the mental incapacity of the deceased, in denying appellant's motion at the close of all the evidence to dismiss the action, and in entering judgment for respondent.

The facts involved in the appeal now before us, in brief, are as follows: For some years prior to 1924, insured was employed as a teller in the Federal Reserve Bank at Spokane. He and respondent lived with their six children outside the city limits. Besides a house, the community owned a three thousand dollar insurance policy and several industrial policies, all issued by appellant. Two of these industrial policies constitute the subject matter of this litigation. One was in the amount of two hundred sixty-five dollars with a premium of twenty-five cents per week; the other in the amount of one hundred six dollars with a premium of ten cents per week. Each policy provided that, upon receipt of proof of the insured's death, the amount of the insurance would be paid to his executors or administrators, unless payment be made under the "facility of payment provision." This provision gave the insurer authority to make payment to any person related to the insured by blood or marriage, and a receipt signed by such person was deemed sufficient proof of payment.

The last twenty-seven years of Mr. Page's life was spent in very poor health. In addition to becoming afflicted with progressive muscular atrophy in 1912, he suffered a hip fracture in 1924, causing total incapacitation and necessitating confinement to a wheel chair until his death. In 1935, Mr. Page also acquired cardiovascular-renal disease. His death in November, 1939, was diagnosed as nephritis.

When insured became totally disabled in 1924, respondent was compelled to support the family. Everything possible was done to keep insured not only physically comfortable, but also mentally cheerful and content. For some time, a joint checking account was maintained and he attended to the payment of household expenses. As insured's health grew worse, this

account was discontinued. To keep him occupied, respondent established a twenty dollar petty cash fund from which he would pay small household bills and the weekly premiums on the policies in question. Both the money and the insurance policies were kept in a "strong box" in his desk. He exercised particular care in maintaining an accurate record of his disbursements. As time passed, his vision failed and he became more paralyzed and helpless. He was also irritable, excitable, and obstinate, tolerating no opposition to his wishes. At times, he became hysterical, even threatening physical injuries to himself. Moreover, he believed that he possessed great business acumen and would plan business ventures. To relieve his restlessness, he performed light office duties in his son's insurance office for about ten days in November, 1938, his health preventing a longer period.

In May, 1938, V. L. Peterson, an employee of appellant, who had collected the premiums for many years, called upon Mr. Page at his request. Page informed Peterson that he wished to surrender the policies in question. It was then explained to insured that the dividends would pay the premiums on the policies for a number of years and that the policies at maturity or at death would have a value of five hundred dollars. In reply to a question to state what Page did and said, Peterson testified that:

"He [Page] said that he realized that the valuation of the policies with the dividends, and he appreciated the same, but he had to have the money.

"After arguing with him, and talking with him over half an hour and explaining the policy and the dividends, he still insisted on cash surrendering the insurance, so all I could do was to write up a cash surrender form, and give it to the superintendant with the policies."

As a reason for surrendering the policies, Page stated that he needed the money to pay certain bills, which unknown to him had been paid. Thereafter, the necessary applications were signed by insured. Before appellant accepted the offer to surrender, however, its assistant superintendent called upon Page. He testified that insured stated:

"Q. When you told him what the purpose of your business was, what, if anything, did he say, if you recall? A. First he explained to me that Mr. Peterson had gone over the matter with him. As I am required to do, I went over the entire transaction with him again, explaining the accumulated dividends, what the policy would be worth in the event of his death, and what it was worth then as cash, and he explained that he had understood that, but that he needed this money for current bills, and at that time he mentioned water obligations, I believe."

Subsequently, Peterson delivered to insured a check for the cash surrender value. The check shows the endorsements of Winfield H. Page and Charles Page, his son. On being interrogated, Charles Page verified his signature, but stated that he did not remember cashing it. What became of the proceeds was never discovered.

Appellant contends that insured possessed the mental capacity to contract with respect to the surrendering of the two policies, and that, in any event, it could not be held liable for the reason that respondent represented to the public that insured was normal, and that it was not apprised of his mental condition. Respondent, on the other hand, maintains that insured was mentally incompetent to contract; that appellant was acquainted with facts sufficient to make it guilty of constructive fraud in accepting the policy cancellations; and that respondent possessed a vested interest in the policies which could not be terminated without her consent.

The first question to be determined is, whether or not the insured possessed the requisite mental capacity to contract with respect to the surrender of the insurance policies. Respondent's assertion of mental incompetency is based on insured's physical condition, his excitability and attitude during the last years of his life, his sale around 1930 of the family automobile, his installation in 1934 of a new furnace in the house, his attempt in 1935 to change the benefits of the three thousand dollar policy from the payment of 3.2% interest thereon during respondent's lifetime to monthly payments of one hundred dollars per month, and his surrender of the policies in question.

To consider properly insured's mental capacity, it is necessary to detail at some length the testimony of respondent, Drs. Jennings and Lynch, Charles Page, and Robert Page, respondent's sons. Having referred already to the insured's physical condition and excitable nature, we shall advert to the car transaction. This consisted of a sale by Page in 1930 of the family's 1924 Dodge for fifty dollars a short time after a like sum had been spent for new tires.

With reference to the furnace incident, the installation of hot air for a pipeless system which respondent asserts was ordered by insured without thinking the idea through, respondent testified as follows:

"Q. Who conceived, first, the idea that there should be a furnace change in the house, from pipeless to hot air? Was that your idea or Mr. Page's, or both? Did you agree on it? A. Well, I can't tell you that exactly. Those things came up and we talked about them, and I know that previous to the change we were not satisfied with the pipeless furnace, and we had expressed our dissatisfaction, and we expected to change it over, but I don't know whether I mentioned it or he mentioned it first. I know we were dissatisfied with the old way. Q. He didn't do this out of a

clear sky, and without previous discussion about change? A. No, he didn't. We had discussed it."

It is to be observed that this incident was not the result of hasty action, but had been previously discussed before the installation.

In regard to the change of payment of the three thousand dollar insurance policy, Robert E. Page, an insurance man, stated that he believed his father was mentally incompetent. He admitted, however, that in December, 1938, his father was induced to sign a beneficiary provision reinstating the original provisions of the policy. Concerning this transaction, the following colloquy was had between Page and appellant's counsel:

"Q. I say, there are many persons, who, unless they give actual study to the policy, might have arrived at the same conclusion that your father did? A. Yes. Q. That wouldn't mean that they were mentally incompetent, would it? A. No, they didn't study the policies."

In regard to this witness' testimony, it should be remembered that insured was permitted to work in the witness' insurance office for ten days in November, 1938, six months after the occurrence of the questioned transaction.

Furthermore, respondent and her two sons stated that, until the last year of his life, insured had read the newspapers, listened to the radio, and manifested interest in local politics, local athletic contests, and world affairs. Charles Page testified that his father was able to discuss current events intelligently and that his mind was clear. Dr. E. S. Jennings, brother of respondent, who attended insured for over ten years, refused to qualify as an expert, but stated:

"As to personal judgment, I would say that he wasn't competent to transact business. That is personal with me, of course, but with what I know of his physical

condition and what should have happened in his brain in the latter part of his life."

When asked if insured had capacity to understand the cash surrender transaction, he said: "I wouldn't know whether he did or not." Dr. J. W. Lynch, a qualified brain surgeon, on the other hand, testified that insured was mentally capable of entering and understanding a contract, that he was capable of understanding the particular contract in question, but that, since his personality was warped and since he thought of himself only, he could not weigh the consequences of his actions.

The rule to be applied in cases of this character is so well stated in 17 C. J. S. 479, § 133, that we quote from it as follows:

"To make a valid contract each party must be of sufficient mental capacity to appreciate the effect of what he is doing and must also be able to exercise his will with reference thereto.

" . . . but mere mental weakness falling short of incapacity to appreciate the business in hand will not invalidate a contract; physical condition not adversely affecting mental competence is immaterial, and neither age, sickness, extreme distress, nor debility of body will affect the capacity to make a contract or a conveyance, if sufficient intelligence remains to understand the transaction.

"Where a person possesses sufficient mental capacity to understand the nature of the transaction and is left to exercise his own free will, his contract will not be invalidated because he was of a less degree of intelligence than his co-contractor, because he was fearful or worried; because he was eccentric or entertained peculiar beliefs; or because he was aged or both aged and mentally weak, or insane; . . .

"*Test of capacity and degree of incompetence.* The test of mental capacity to contract is whether the person possesses sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged. It is not necessary to show that

a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue, . . . On the other hand, to avoid a contract it is insufficient to show merely that the party was of unsound mind or insane when it was made, but it must also be shown that this unsoundness or insanity was of such a character that he had no reasonable perception or understanding of the nature and terms of the contract. The extent or degree of intellect generally is not in issue, but merely the mental capacity to know the nature and terms of the contract."

A more concise statement is found in 1 Williston on Contracts (Rev. ed. 1936) 754, § 256:

"The question, therefore, should depend and, according to the great weight of modern authority, does depend upon whether the alleged lunatic had sufficient reason to enable him to understand the nature and effect of the act in dispute."

The rule relative to mental capacity to contract, therefore, is whether the contractor possessed sufficient mind or reason to enable him to comprehend the nature, terms, and effect of the contract in issue. In applying this rule, however, it must be remembered that contractual capacity is a question of fact to be determined at the time the transaction occurred, 17 C. J. S. 483, § 133; that everyone is presumed sane; and that this presumption is overcome only by clear, cogent, and convincing evidence. *Roberts v. Pacific Tel. & Tel. Co.*, 93 Wash. 274, 160 Pac. 965. That he was perhaps eccentric and excitable is not denied. Moreover, that he exercised poor business judgment, likewise, cannot be contradicted. Yet even though these are conceded, they do not spell mental incapacity to contract. *Kaleb v. Modern Woodmen*, 51 Wyo. 116, 64 P. (2d) 605.

Furthermore, the incidents relative to the sale of

the car and the installation of the furnace are very far removed in point of time from the surrender of the policies. Aside from that, they do not indicate other than bad business judgment. The evidence of the doctors is not convincing in that they were somewhat contradictory and were based for the most part upon Page's physical condition. They stated that he had poor business judgment, but was mentally competent of understanding a simple contract. The fact that, as one doctor stated, Page "didn't consider any consequences; he considered only himself" manifests no more than a selfish purpose upon the part of Page to acquire the money upon the policies, and that he failed to take into consideration the effect that it would have upon the dependents when he passed away.

The statement that

"He was possessed of sufficient mental capacity in May, 1938 to know that what he was doing was surrendering the policies that would have a value of approximately $500 at his death, for a sum of $190,"

shows clearly that Mr. Page did know the consequences of his acts.

As an additional reason for denying respondent's recovery, from 1924 to 1938 she allowed insured not only to keep the policies in his possession, but also to pay the premiums. To appellant, then, she inferentially, if not actually, indicated that her husband was competent to manage any matter concerning the insurance. Moreover, a careful search of the record discloses that appellant was neither informed nor knew of any mental condition. Therefore, having by her conduct held out to the world that insured was competent to manage the affairs at home as well as those relating to the policies, respondent is not in any position to contend that insured was mentally incompetent and that she should recover the face value of the poli-

cies. *Schade v. Western Union Life Ins. Co.,* 125 Wash. 200, 215 Pac. 521; *Franklin Life Ins. Co. v. Morrell,* 84 Ark. 511, 106 S. W. 680; *Whitlow v. Sovereign Camp, W. O. W.,* 199 Iowa 579, 202 N. W. 249; *Missouri State Life Ins. Co. v. Hill,* 109 Ark. 17, 159 S. W. 31.

 Respondent next maintains that appellant was guilty of constructive fraud in its dealings with insured. The evidence adduced, however, fails to support this contention. Not only was the transaction explained thoroughly to insured by appellant's agent, Mr. Peterson, but also by its assistant district superintendent. Furthermore, Peterson testified as follows:

"Q. Mr. Peterson, is there any beneficial advantage, or any advantage to you, as an agent of that company in having these two policies cash surrendered? A. No advantage at all. Q. Would there be any disadvantage? A. Yes, it would hit my conservation commission, and my year's allotment. Q. What is meant by 'conservation commission'? A. We are paid so much for conserving business, and that is what it is. Q. That is the only thing? A. Yes, it hurts our year's allotment, which we are required to make."

Appellant's assistant district superintendent testified to the same effect.

Respondent urges that she is entitled to recover in any event for the reason that she had a vested property right in the policies which could not be taken without her knowledge or consent.

Her counsel rests this contention mainly upon our decision in the case of *Occidental Life Ins. Co. v. Powers,* 192 Wash. 475, 74 P. (2d) 27, 114 A. L. R. 531. In that case Mr. Powers secured a life insurance policy payable on his death to his wife. The premiums were paid from community funds. Powers, some eight months before his death, in proper form and without the knowledge or consent of his wife, designated his mother and his private secretary as new beneficiaries.

This court held that the proceeds of the policy constituted community property, that the wife had a vested interest therein which could not be taken without her knowledge or consent. After calling attention to some of our early cases, we stated:

"In this state, as stated in those cases, and as has always been stated by this court, the wife has a vested property right in the community property equal with that of her husband and in the income of the community, including salaries or wages of either husband or wife, or both."

That situation and the one at bar are entirely different. Obviously respondent has failed to distinguish between a gift of community property without the knowledge or consent of the wife, and a contract discharging *for a consideration* an obligation to the community without knowledge or consent of the wife. Consequently, the *Powers* case is not in point.

That the husband as statutory agent for the community has complete power to buy or sell community personalty and make its contracts is a well-established rule in this state. Furthermore, he can do this not only without his wife's knowledge or consent, but against her objections when he reasonably believes that the community will benefit. *Baker v. Murrey,* 78 Wash. 241, 138 Pac. 890; *Bellingham Motors Corp. v. Lindberg,* 126 Wash. 684, 219 Pac. 19. Thus, insured, as agent for the community, possessed the power to enter into the contract in issue without respondent's knowledge or consent. Moreover, the pleadings admitted and the testimony showed that the community received the consideration (appellant's check) for the discharge of appellant's obligation.

Respondent contends, however, that, because of insured's confinement and because of her becoming head of the family, insured impliedly constituted her as statutory agent, and, therefore, he did not possess the

power to contract with appellant. The conclusion is untenable since insured never delegated the duty to respondent to deal with appellant, but at all times (1924 to 1938) he retained and exercised it himself.

We hold that in this case the respondent was not entitled to recover. The judgment is therefore reversed.

ROBINSON, C. J., BLAKE, and JEFFERS, JJ., concur.

BEALS, J. (concurring)—While I am in entire accord with the foregoing opinion, I cannot refrain from stating an additional reason which supports the reversal of the judgment of the superior court.

As stated by the majority, the check which appellant drew in favor of the late Winfield H. Page bears Mr. Page's endorsement and that of Charles Page, his son, who evidently cashed the check. At the time of the trial, Charles Page was twenty-two years of age. He had cashed the check approximately two and one-half years previously. He testified that on several occasions he had procured, at the savings bank, small sums of money on receipts signed by his mother and father. Both on direct and cross-examination, he stated that the check in question bore his father's signature and his own, but that he had absolutely no recollection of signing the check, or taking it to the bank, or procuring the money, or what he did with the money, although it is perfectly evident that he must have done all of these things, and disposed of the money in some manner.

This testimony seems to me to be absolutely incredible. While this does not necessarily or even probably indicate that Charles Page converted the proceeds of the check to his own use, without his father's consent, it does very strongly suggest that the proceeds of the check were used for some purpose concerning

which both Charles and his father were fully advised, but which they did not desire to mention to Mrs. Page. This purpose, however, may have been a perfectly proper purpose, for the benefit of the community and family, and one which Winfield H. Page might well, as *de jure* manager of the community, have been perfectly justified in carrying out. The fact that Mr. Page, in his conversation with appellant's agent, assigned some other reason for desiring the money, nowise militates against this possibility.

So far as the record shows, the proceeds of the insurance policy may have been by Mr. Page devoted to some proper community purpose, of which Mrs. Page would have entirely approved had she known of the purpose and the circumstances connected therewith.