[No. 5173–1. Division One. July 17, 1978.]

BETTY HARDY JOHNSON, *Individually and as Guardian,* ET AL, *Respondents,* v. ARTHUR PERRY, *Appellant.*

*Richard B. Sanders,* for appellant.

*Montgomery, Purdue, Blankinship & Austin* and *John D. Blankinship,* for respondents.

RINGOLD, J.—This is an action brought in November 1975, to quiet title and to obtain judicial confirmation of the forfeiture of a real estate contract. As an affirmative defense the defendant purchaser, Arthur Perry, alleged that he lacked the mental capacity to enter into the contract. Perry's counterclaims alleged: (1) trespass, (2) tortious interference with his contractual relations with his tenants, (3) abuse of process, (4) breach of contract, and (5) misrepresentation, unequal position, duress, lack of capacity,

unconscionability and failure of consideration. He sought damages and injunctive relief. The defendant's jury demand was stricken and the cause was tried to the court, which granted the plaintiff's relief and overruled or dismissed all of Perry's affirmative defenses and counterclaims. This appeal followed. We find no error in the trial court rulings and affirm.

Perry purchased the subject property, an apartment building, from the Beau–Dang Corporation in 1969. From 1969 until 1972 he made the $800 monthly payments as required by the real estate contract. Shortly after Perry had purchased the property the seller assigned its interest to Fern Shaffer, who subsequently conveyed her interest by means of quitclaim deeds to the present plaintiffs, her daughters, sons–in–law, and their children.

From the record it is not clear when Mrs. Shaffer died, but during the year 1972 the payments were made by Perry to the plaintiffs and he negotiated with the plaintiffs in an effort to reduce the payments. The plaintiffs accepted reduced payments of $500 per month, without agreeing to a modification of the contract. Perry eventually stopped the payments. By February 1974, he was in default under the contract in the amount of $16,800. On April 1, 1974, the plaintiffs directed to Perry a notice of intention to declare a forfeiture and cancel the real estate contract. A declaration of cancellation of the contract and forfeiture of Perry's interest was made on April 29, 1974. Subsequently unlawful detainer actions were commenced to dispossess the tenants of the building, which actions were the basis for several of Perry's counterclaims.

Perry contends that the trial court erred in (1) denying his demand for a jury trial; (2) in permitting the plaintiffs to enforce a real estate contract to which they were not a party; and (3) in failing to find that Perry lacked capacity to enter into the contract. Error is also assigned in the trial court's dismissal of Perry's counterclaims.

## JURY TRIAL

■ The case *Scavenius v. Manchester Port Dist.*, 2 Wn. App. 126, 129–30, 467 P.2d 372 (1970), interprets CR 38 and 39 to vest discretion in the trial court in deciding whether a jury trial should be granted.

We hold that the only effect of the adoption of CR 38 and 39 is to vest in the trial court wide discretion in cases involving both legal and equitable issues, to allow a jury on some, none, or all issues presented. Subsection (c) of CR 39 allows an advisory jury on equitable issues in the discretion of the trial court.

Such discretion should be exercised with reference to many factors including, but not necessarily limited to the following: (1) who seeks the equitable relief; (2) is the person seeking the equitable relief also demanding trial of the issues to the jury; (3) are the main issues primarily legal or equitable in their nature; (4) do the equitable issues present complexities in the trial which will affect the orderly determination of such issues by a jury; (5) are the equitable and legal issues easily separable; (6) in the exercise of such discretion, great weight should be given to the constitutional right of trial by jury and if the nature of the action is doubtful, a jury trial should be allowed; (7) the trial court should go beyond the pleadings to ascertain the real issues in dispute before making the determination as to whether or not a jury trial should be granted on all or part of such issues.

Applying the *Scavenius* criteria, we see that both parties seek equitable relief and the main issue, contract forfeiture, is equitable.

There is no record before this court by which we can determine which factors within the parameters of the *Scavenius* rule were considered by the trial court. We conclude that in the absence of a contrary showing, the trial court properly exercised its discretion.

## PLAINTIFF'S RIGHT TO ENFORCE THE CONTRACT

Before her death Fern Shaffer executed and delivered quitclaim deeds to her daughters, sons–in–law, and grandchildren. The quitclaim deeds conveyed the *entire legal*

*title* which Fern Shaffer had to the property here in question. At the commencement of this action, guardians ad litem were appointed to represent the minor plaintiffs. No heirs or other persons claiming any right to receive the payments challenged the plaintiffs' right to enforce the contract and to receive payments.

Perry contends that the plaintiffs are not entitled to enforce the contract because the legal title had been conveyed to them by quitclaim deeds rather than by deeds and assignments of the vendor's interest in the real estate contract. Perry relies on *Biehn v. Lyon,* 29 Wn.2d 750, 755, 189 P.2d 482 (1948), where our court stated: "We have on numerous occasions recognized that the vendor in a real estate contract may assign the contract to one person and convey legal title to another; or he may convey the legal title and retain the contract and the right to receive payments thereon." (Citations omitted.) From the proposition that a vendor may divest himself of legal title yet retain the right to receive the payments, as in *Biehn,* it does not follow that when the conveyance is silent as to the disposition of the right to receive payments, the grantee does not succeed to the right to enforce the contract.

■ Neither party has cited authority dealing with the question whether the conveyance of a contract vendor's entire legal title to a third person without reference to the rights under the contract of sale gives to the third person the right to enforce the vendor's rights against the purchaser.[1] We find the general rule stated in 77 Am. Jur. 2d *Vendor and Purchasers* § 377, at 527 as follows:

A conveyance of his interest by a vendor to a third person, or an assignment by the vendor of the executory contract, will as a general rule pass the right to receive the purchase money that remains unpaid at the time the purchaser has notice, or is chargeable with constructive notice, of the conveyance.

---

[1]The paucity of authority may be attributed to a self–evident intention giving the vendor's grantee the right to receive the payment, arising from an unqualified conveyance of the entire legal title.

The cases cited by the editors of American Jurisprudence supporting the rule are not definitive. The court in *Biehn* ascertained the intent of Biehn to retain the right to the payments due under the contract even though he conveyed the title by quitclaim deed to his intended bride before the wedding. We hold that upon the conveyance of the vendor's legal title, the right to receive the payments due under a real estate contract passes to the grantee in the absence of showing an intention of the vendor to make a separate disposition of the right to enforce performance of the contract.

Perry made payments to the plaintiffs and negotiated with the plaintiffs to accept reduced payments and to modify the contract. He now has no basis upon which to challenge the plaintiffs' right to enforce the contract.

### PERRY'S CAPACITY TO CONTRACT

Perry was born in February 1910, and formally completed the third grade. He continued to attend school until age 14. Perry did not complete the fourth grade, and worked shining shoes. Later he became a hotel porter. In 1940 he was employed as a laborer in a steel mill. In 1944 he moved to the Seattle area and was employed as a laborer at the Navy yard. In 1945 he went to sea, working as a room steward and as a cook. Sometime early in the 1950's, Perry met Earl F. Goodchild, who at the time was engaged in the real estate business. Mr. Goodchild was referred to Mr. Perry by a friend of Perry's who told Goodchild that this merchant seaman friend had a good pile of money from his trips and he would blow it all and go back out broke.

Mr. Goodchild testified:

So he said, "I ought to introduce you and see if you could sell him some property so he would have something."
Q: You were in the business of selling property then?
A: Yes.
Q: Did you meet with Mr. Perry?
A: Yes. The next trip in, I guess it was, he introduced me to Mr. Perry, and we talked a bit, and he said, yeah, he would be interested in buying something. And he said, "What do I do?"

Well, I said, "You make a down payment and make monthly payments."

And he said, "Okay, fine. I am going out in a couple of days. Here's $1,500. Buy me something."

So he gave me the $1,500 in cash and I put it in my pocket. And then he—

The $1,500 was the down payment for the purchase of the Terrace Apartments. During the years Perry owned the Terrace Apartments, he always had someone assist him although he could read and write. In 1969, the Terrace Apartments were sold for $55,000. This money from the sale of the apartments gave Perry the requisite down payment of $50,000 to purchase the apartment house, subject of this action, for $125,000 with the balance at 7 1/2 percent interest with monthly payments of $800 plus taxes and insurance.

Perry's basic defense at the time of trial and on this appeal is lack of capacity on his part to enter into the contract. The trial court had before it the testimony of Mr. Goodchild, Mr. Perry's friends who had helped him manage the apartment houses and collect rentals, and the testimony of a psychiatrist and of a psychologist. The court made finding of fact No. 6:

None of the affirmative defenses or counterclaims alleged by the defendant Arthur Perry were proven by either clear, cogent and convincing evidence nor by a preponderance of the evidence.

It is often difficult to frame negative findings of fact. We regard this finding as a conclusion of law, and read it in the light of the trial court's oral decision, *Rutter v. Rutter,* 59 Wn.2d 781, 784, 370 P.2d 862 (1962).

The trial court well summarizes the issue:

The evidence in this case I think clearly shows that the defendant Mr. Perry was a man of limited education, limited formal education, I should say. We do have the testimony of the psychiatrist and psychologist as to his I.Q. score on the Wechsler Intelligence Test, and we have their opinions. I think it boils down that he was, in their

opinion, based upon an I.Q. test, not capable of understanding all of the ramifications of a business transaction of this type.

The question is: Does that establish a legal defense to this contract?

. . . .

I think we must first look at the legal defense of lack of mental capacity. I think if I were to follow the argument of Mr. Sanders we would destroy the law of contracts to a degree that this court is not willing to do. I think there's no question but perhaps the defendant Mr. Perry, by reason of his lack of formal education, his entire life that has been testified to, would not be able to understand all of the nuances as one should at the time of the agreement, and the legal requirements and what legally follows from the failure to make timely payments. I think it would be fair to say that all he knew was for $50,000 he was buying an apartment house; he would have to make monthly payments at a certain sum per month, and that he would have certain expenses, et cetera, and that is what he went into. I don't think that rises to a lack of mental capacity. So, as a legal proposition, I find that the affirmative defense of mental incapacity, as well as the other affirmative defenses have not been sustained.

■ The rule is stated in *Page v. Prudential Life Ins. Co. of America,* 12 Wn.2d 101, 109, 120 P.2d 527 (1942):

The rule relative to mental capacity to contract, therefore, is whether the contractor possessed sufficient mind or reason to enable him to comprehend the nature, terms, and effect of the contract in issue. *In applying this rule, however, it must be remembered that contractual capacity is a question of fact to be determined at the time the transaction occurred, . . .* that everyone is presumed sane; and that this presumption is overcome only by clear, cogent, and convincing evidence.

(Italics ours.)

■ Perry relies heavily on *Harris v. Rivard,* 64 Wn.2d 173, 390 P.2d 1004 (1964) which adopts the standards set in *Page v. Prudential, supra.* The trial court in *Harris* determined that one of the contracting parties was incompetent to enter into a contract. The Supreme Court sustained the trial court's findings, holding:

Ever since the case of *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn. (2d) 570, 575, 343 P. (2d) 183 (1959), this court has refused to substitute its opinion for that of the trial court where there is substantial evidence before the court.

. . .

. . . His findings will stand undisturbed.

*Harris v. Rivard, supra* at 175-76.

Perry argues, however, that because the testimony of the psychiatrist and psychologist indicates that Mr. Perry is a man with a low I.Q., incapable of understanding all the ramifications of a business transaction of this type and unable to understand the legal requirements of what legally follows in the failure to make timely payments that therefore, as a matter of law, this court should reverse the findings of the trial judge.

Dr. Robert G. Wright, a board–certified psychiatrist, testified that he saw Mr. Perry in 1972 during the time that he was charged with the criminal offense. Dr. Wright stated that he had referred Mr. Perry for an intelligence test and the results which he obtained were: verbal, 78; performance, 73; a full–scale I.Q. of 74, and in his opinion, Mr. Perry was "borderline functioning." In response to a question as to whether or not within reasonable medical certainty he could say that Mr. Perry was of sufficient mind or reason to comprehend the nature and terms and effect of the contract in February 1969, Dr. Wright responded: "He was not competent at that time to understand the contract."

Dr. Donald Akutawaga, a clinical psychologist, administered the Wechsler Adult Intelligence Test in 1976. He determined from the test that Mr. Perry had a full–scale I.Q. of 74, which is borderline, just above mental deficiency.

Dr. Akutawaga testified that Perry could probably function in normal, everyday types of business transactions, but "I think he would have great difficulty in dealing with anything complex." Dr. Akutawaga doubted that Perry could understand the nature, terms and effects of the real estate

contract. The opinions of Drs. Wright and Akutawaga were considered and weighed by the trial court.

A most dangerous precedent would be set were we to accept as a matter of law the results of a standardized intelligence test or the education of a party as a standard by which we will determine the mental capacity of an individual to contract. There was substantial evidence to sustain the trial court's determination that the affirmative defense of lack of capacity to contract had not been proved by clear, cogent and convincing evidence and the finding will not be disturbed.

Affirmed.

WILLIAMS and MUNSON, JJ., concur.

Reconsideration denied October 17, 1978.

Review denied by Supreme Court February 16, 1979.