## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Estate of<br><br>CURTIS E. CARLSON,<br><br>Deceased.<br>_____<br><br>DAVID WANDS, D.D.S., as Personal Representative of the Separate Property Portion of the Estate of Curtis E. Carlson,<br><br>Respondent,<br><br>v.<br><br>DONA SEELY, D.D.S., individually and as Personal Representative of the Community Property Portion of the Estate of Curtis E. Carlson,<br><br>Appellant.<br>_____ | No. 77881-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br><br><br><br><br>FILED: August 5, 2019 |

LEACH, J. — Curtis Carlson died on March 19, 2014. At the time of his death, he was in the process of dissolving his 32-year marriage to Dona Seely. On March 13, 2014, he changed his individual retirement account (IRA) beneficiary to Seely. Seely appeals the trial court's order declaring the beneficiary change null and void. She challenges the sufficiency of the evidence to prove that Carlson did not have transactional capacity on March 13 and that

She exercised undue influence over him. Because clear, cogent, and convincing evidence supports the trial court's extensive findings, we affirm.

FACTS

Neither party disputes the following findings.[1] Carlson had a valid last will and testament when he died on March 19, 2014, at 71 years old from a terminal lung disease (idiopathic pulmonary fibrosis). Carlson was diagnosed with degenerative lung disease years earlier but experienced a rapid decline and hospitalization in February 2014. At the time of his death, Carlson was in the process of dissolving his 32-year marriage to Seely. Witnesses described their dissolution as "adversarial" and their relationship as "strained."

Carlson was an orthodontist and a periodontist. Seely is an orthodontist. They had separate practices but shared a floor of an office building they owned together. They had two children together, Eric Carlson and Gina Rowles. Carlson had one daughter from a prior marriage, Jennifer Theckston.

On February 15, 2014, Carlson was admitted to Overlake Medical Center after experiencing a worsening of his lung disease. He remained in the hospital until he was transferred to Evergreen Hospice on March 7, 2014, where he later died. At the time of Carlson's decline, he was still operating his orthodontia practice. Seely claims that on March 8, she and Carlson made an oral

---

[1] This court views unchallenged findings of fact as true on appeal. Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

agreement that she would treat Carlson's remaining patients in exchange for Carlson designating her the beneficiary of his IRA worth approximately $250,000 pretax. Seely treated 140 of Carlson's orthodontic patients. David Wands, the court-appointed personal representative of Carlson's estate, agrees with Seely that she is entitled to compensation for these services. She estimates the value of her services is $270,000.

In December 2013, after Carlson moved out of the house he shared with Seely, both he and Seely changed the beneficiary designations of their respective IRAs. Carlson removed Seely as the beneficiary of his IRA and named his estate as the sole beneficiary. On March 5, 2014, he met with John Sullivan, his estate attorney, and changed his will to expressly exclude Seely. On March 13, 2014, Carlson signed a form making Seely the beneficiary of his IRA. The next day, he signed a form immediately transferring the contents of his IRA to an account Seely owned.

On March 10, 2017, Wands filed this lawsuit, asking the trial court to find the March 13, 2014, beneficiary change form and the March 14, 2014, transfer form null and void. After a four-day bench trial, the trial court concluded that both documents were null and void because clear, cogent, and convincing evidence established that Carlson lacked testamentary and transactional capacity on March 13 and 14, that the estate raised a presumption of undue influence, and

that Seely did not rebut this influence. Seely asked the court to reconsider its decision. The court granted this request in part, denied it in part, and issued amended findings and conclusions with minor revisions. Seely appeals.

## STANDARD OF REVIEW

Whether a person had the capacity to make a will or to contract is an issue of fact.[2] Whether an individual exercised undue influence over another is also a question of fact.[3] A party asserting lack of capacity to make a will or undue influence must prove this claim by clear, cogent, and convincing evidence.[4] On appeal, this court determines whether substantial evidence supports a finding of lack of capacity or undue influence in light of the "'highly probable' test."[5] "Evidence which is 'substantial' to support a preponderance may not be sufficient

---

[2] In re Estate of Kessler, 95 Wn. App. 358, 373 n.28, 977 P.2d 591 (1999); Page v. Prudential Life Ins. Co. of Am., 12 Wn.2d 101, 109, 120 P.2d 527 (1942). Seely contends that whether Carlson had testamentary capacity is a question of law reviewed de novo. She relies on In re Estate of Alsup, 181 Wn. App. 856, 869, 327 P.3d 1266 (2014), in which Division Three of this court stated that whether the appointment of a full guardian automatically divested Alsup of the right to make a will was a question of law reviewed de novo. But it also held, "Further proceedings are required to determine the factual issue of whether Mr. Alsup possessed testamentary capacity at the time he executed the 2001 will." The court thus defined the issue of testamentary capacity as a factual issue. Alsup, 181 Wn. App. at 874.

[3] In re Trust & Estate of Melter, 167 Wn. App. 285, 301, 273 P.3d 991 (2012).

[4] Johnson v. Perry, 20 Wn. App. 696, 703, 582 P.2d 886 (1978); Melter, 167 Wn. App. at 301.

[5] Melter, 167 Wn. App. at 301 (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

to support the clear, cogent, and convincing requirements."[6] But a reviewing court may not reweigh the evidence or reassess the credibility of the witnesses.[7]

This court reviews de novo whether the trial court's conclusions of law flow from its findings.[8]

## ANALYSIS

### Carlson Lacked Transactional Capacity on March 8 and March 13, 2014

First, Seely contends that the estate did not present clear, cogent, and convincing evidence proving that Carlson lacked testamentary and transactional capacity on March 8 to agree orally to change his IRA beneficiary and on March 13 to sign the beneficiary change form. We disagree.

To void a transaction for lack of capacity, a party must show the signer "'was of unsound mind or insane when [he] made [the contract and] this unsoundness or insanity was of such a character that he had no reasonable perception or understanding of the nature and terms of the contract.'"[9] A signer must "possess sufficient mind or reason to enable him to comprehend the nature, terms, and effect of the contract in issue."[10] The signer's mental capacity at the

---

[6] In re Estate of Reilly, 78 Wn.2d 623, 640, 479 P.2d 1 (1970).

[7] Sego, 82 Wn.2d at 739-40.

[8] Dep't of Labor & Indus. v. Cascadian Bldg. Maint., Ltd., 185 Wn. App. 643, 647, 342 P.3d 1185 (2015).

[9] Page, 12 Wn.2d at 109 (quoting 17 C.J.S. Contracts § 133, at 479 (1939)).

[10] Page, 12 Wn.2d at 109.

moment of the transaction is the determinative factor.[11] "[But] evidence related to the [signer's] mental condition during a reasonable time before and after [the transaction] is relevant and admissible even if remoteness affects its weight."[12] "[A] radical departure from a prior testamentary scheme supports an inference that the later will is the product of an unsound mind."[13]

Seely relies on In re Estate of Bussler.[14] There, Division Two of this court affirmed the trial court's finding that the plaintiff did not overcome the presumption that Bussler had testamentary capacity.[15] The court relied, in part, on Bussler's medical records, which stated that she had "[m]ildly impaired" cognition and "grossly impaired" memory about a month before she signed the will.[16] But these records also stated that she was "alert and oriented to person and place" two days before she executed her will.[17] The notary who reviewed the terms of the will with Bussler stated that Bussler "appeared ill, had a hard time moving without a cane, was in a wheelchair, and looked like she had lost most of her hair."[18] But the notary "felt that [she] was alert, cognizant, and understood the documents she was reviewing and signing."[19] The court noted

---

[11] Kessler, 95 Wn. App. at 371.
[12] Kessler, 95 Wn. App. at 371.
[13] Kessler, 95 Wn. App. at 371.
[14] 160 Wn. App. 449, 247 P.3d 821 (2011).
[15] Bussler, 160 Wn. App. at 464-65.
[16] Bussler, 160 Wn. App. at 457-58.
[17] Bussler, 160 Wn. App. at 458.
[18] Bussler, 160 Wn. App. at 456.
[19] Bussler, 160 Wn. App. at 455-56.

that the gradual but steady change in testamentary disposition and the testimony of those who witnessed the will supported that she was "generally mentally sound, knew what she was doing, and that the 2009 will reflected how she wanted her estate distributed after her impending death."[20]

Seely claims that like Bussler, Carlson was not in good health. But she maintains that also like Bussler, the fact that Carlson's medical records stated that he had impaired cognition and was "occasionally confused" does not defeat the presumption of capacity; the estate did not show that this confusion prohibited Carlson from understanding the transaction. She states that Theckston, Sullivan, Wands, and Seely's financial advisor Paul Fahey Sr., all testified that Carlson had capacity at various points while he was in hospice.

The trial court made 103 findings of fact. An appellate court accepts unchallenged findings as true on appeal.[21] Although Seely challenges a number of these findings, she neither challenges all of the relevant findings nor provides citations to the record to show that substantial evidence does not support the findings that she challenges. The relevant findings include the following and we identify those that she challenges.

1. On March 7, 2014, Carlson was admitted to hospice. The intake notes state that he experienced a "rapid progression of his idiopathic pulmonary

---

[20] Bussler, 160 Wn. App. at 464.
[21] Robel, 148 Wn.2d at 42.

fibrosis" and he "was oriented to person and place, but some 'clouding of consciousness' was noted." He would require "active titration of medications, and frequent RN [registered nurse] monitoring." He was suffering from "severe anxiety with any activities."

2. On March 8, Carlson's treating hospice physician described his anxiety as "high." His physician stated in the chart notes that Carlson "reported that his wife who he says is bipolar is coming this evening to finish up some of [his] financial unfinished business. He said that she often changes the subject and makes him very anxious." Carlson required "dosing x3 last night [of Ativan] and this morning." Hospital staff described Carlson's confusion, stating,

> Presents with some confusion at times possibly due to lack of oxygen. Got daughters' names mixed up today. In one sentence stated he wanted to get stronger and do some rehabilitation, then when this RN talked about Hospice comfort goals of care he stated, "oh yes, that is what I want."

Chart notes stated that he was "slow to answer questions" and was "lethargic," he was unable to get out of bed and was taking sips of water only occasionally.

3. Dr. Elaine Peskind, a forensic expert who testified on behalf of the estate, stated that when Carlson was admitted to hospice, he met the diagnostic criteria for delirium. She testified that the criteria set forth in the Diagnostic and Statistical Manual of the American Psychiatric Association defines delirium as "a change in mental status characterized by an altered state of consciousness and a fluctuating state of consciousness, confused thinking, and a decreased

awareness of one's environment." Although Seely challenges this finding, Peskind's testimony is consistent with this finding, and Seely does not explain why substantial evidence does not support it. Peskind also testified that the causes of his delirium were hypoxia, defined as a lower-than-normal oxygenation level in the blood, and the effects of the medications he received throughout the day.

4. Seely testified that she and Carlson reached an oral agreement on the evening of March 8 that she would treat his orthodontic patients in exchange for his IRA.

5. Seely testified that she visited Carlson in his hospice room on March 8 and "the first thing that came out was his IRA." But Theckston, who was present at this meeting, testified that she did not hear any mention of Carlson's IRA. She stated that Seely introduced the topic of treating Carlson's patients and did most of the talking. She also testified that Seely agreed to treat his patients and he was relieved, but she did not recall whether Seely and Carlson discussed payment for those services. Although Seely challenges this finding, it is consistent with Theckston's testimony. Seely does not explain why substantial evidence does not support it.

6. Seely's testimony that she reached an agreement with Carlson regarding the treatment of his patients was questionable because of her earlier

sworn testimony related to the will contest that "Carlson did not appear to comprehend and understand the nature of his estate. At the very least, he misjudged the value of his practice and was unable to estimate the value of any claims against his practice from patients for failure to treat or for substandard treatment." Although Seely challenges this finding, it is consistent with her testimony quoted in the record. Seely does not explain why substantial evidence does not support it.

7. Peskind testified that she did not believe that Carlson had the ability to participate meaningfully in decision making about his business affairs on March 8. Although Seely challenges this finding, it is consistent with Peskind's testimony. Peskind identifies the many chart notes on which she relied in forming her opinion, and Seely does not explain why substantial evidence does not support it.

8. On March 11, hospice records document that Carlson was alert but confused at times. Carlson executed a durable power of attorney that Sullivan prepared. It expressly prohibited Seely from filing a petition under RCW 11.94.090[22] to obtain information related to the power of attorney.

9. On March 13, hospice records state that Carlson was "making jokes but appears drowsy and is having occ[asional] difficulty with processing

---

[22] The trial court appears to have mistakenly cited RCW 11.94.090, which does not exist. We believe the trial court intended to refer to RCW 11.92.090.

-10-

information . . . [and] appears to be declining." Although Seely challenges this finding, it is verbatim from the hospice records, and she does not explain why substantial evidence does not support it.

10. The hospice records show that Carlson received a dose of morphine at 2:00 p.m. on March 13 for pain.

11. During the afternoon of March 13, Carlson signed a form that changed the beneficiary of his IRA from his estate to Seely. Paul Fahey Sr., who had worked with Carlson and Seely as a financial advisor since 2006 and who is still Seely's financial advisor, prepared this document. Seely was not present when Carlson signed the form. But she testified that she gave Fahey Sr. directions about Carlson's IRA. Fahey Sr. prepared the document before meeting with Carlson, so Carlson did not fill in any of the information on the form other than his name. He started to sign the "witness" signature line by mistake. He "signed the form . . . while lying in his hospice bed, short of breath, on supplemental oxygen." Fahey Sr. testified that he went to the hospice center with his son, Paul Fahey Jr., in the afternoon and was there about 30 minutes. "The reasonable inference from these facts is that the form was signed sometime after Dr. Carlson received his 2:00 p.m. dose of morphine."

12. Fahey Sr. did not ask hospice staff about Carlson's capacity to execute legal documents or ask Carlson any questions to assess how he was

processing information. Fahey Sr. described Carlson as alert, able to communicate, and adamant that he wanted to transfer the IRA funds to Seely. He testified that Carlson was more lucid than he had been in a few months and had all his faculties. Fahey Sr. stated that he had no doubt that Carlson wanted to transfer the IRA.

13. Carlson told Fahey Sr., "I love you." Fahey Sr. stated that Carlson had never before said this to him but that this was not an unusual thing for his clients to say.

14. The March 13 beneficiary change conflicted with Carlson's statements to Sullivan. Sullivan testified that when he discussed Carlson's will and codicil with Carlson shortly before Carlson died, Carlson wanted to ensure that Seely did not receive any interest in his estate. Although Seely challenges this finding, it is consistent with Sullivan's testimony, and she does not explain why substantial evidence does not support it.

15. Theckston testified that Seely left her a voice mail describing Carlson's condition on March 13 as "all goofed up." Although Seely challenges this finding, it is consistent with Theckston's testimony and Seely does not explain why substantial evidence does not support it.

16. Peskind testified that in her opinion, Carlson lacked the capacity to understand the meaning and effect of the beneficiary change he signed on March

-12-

13 and he did not have testamentary capacity on that day. Seely challenges this finding. Although this finding is consistent with Peskind's testimony, Seely asserts that Peskind's additional testimony shows that her statements about Carlson's testamentary capacity on March 13 are not credible. Seely contends that in response to a question about whether Peskind believed Carlson lacked testamentary capacity, Peskind stated, "I don't know." But Peskind's response to this question was in the context of her statement that Carlson could have understood minor changes and related to an earlier question about whether she believed Carlson had the capacity to execute a new power of attorney on March 11. Seely thus takes Peskind's statement out of context.

17. Fahey Sr.'s testimony that Carlson was more lucid on March 13 than he had been in months was neither "plausible [n]or credible" based on the medical evidence, Peskind's testimony, and Seely's description of Carlson's mental functioning in her prior sworn statements and in the voice mail she left for Theckston. Seely challenges this finding, but based on the findings discussed above, substantial evidence supports this finding. And this court defers to the trial court's credibility determinations.[23]

The evidence described in the above findings provides substantial evidence in light of the highly probable standard to support the trial court's finding

---

[23] <u>Keene Valley Ventures, Inc. v. City of Richland</u>, 174 Wn. App. 219, 224, 298 P.3d 121 (2013).

that clear, cogent, and convincing evidence shows Carlson lacked the capacity to enter into an oral agreement on March 8 to give Seely his IRA in exchange for her promise to treat his patients. And it supports the court's finding that Carlson did not understand the meaning and effect of the beneficiary change that he signed on March 13.

<u>Seely Exercised Undue Influence</u>

Next, Seely asserts that the trial court erred in finding that she exerted undue influence over Carlson. We disagree.

A testamentary gift is invalid if a party shows by clear, cogent, and convincing evidence that the beneficiary exercised undue influence to obtain it.[24] "'Undue influence' that is sufficient to void a will must be 'something more than mere influence but, rather, influence which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice.'"[25] "'[It] involves unfair persuasion that seriously impairs the free and competent exercise of judgment.'"[26] In <u>Dean v. Jordan</u>,[27] our Supreme Court held that certain facts and circumstances, the "<u>Dean</u> factors," raise a presumption that a party exercised undue influence, in

---

[24] <u>Melter</u>, 167 Wn. App. at 295-97.

[25] <u>In re Estate of Barnes</u>, 185 Wn.2d 1, 10, 367 P.3d 580 (2016) (internal quotation marks omitted) (quoting <u>In re Estate of Lint</u>, 135 Wn.2d 518, 535, 957 P.2d 755 (1998)).

[26] <u>Kitsap Bank v. Denley</u>, 177 Wn. App. 559, 570, 312 P.3d 711 (2013) (quoting <u>In re Estate of Jones</u>, 170 Wn. App. 594, 606, 287 P.3d 610 (2012)).

[27] 194 Wash. 661, 671-72, 79 P.2d 331 (1938).

which case the burden shifts to the beneficiary to prove that the gift is not the result of undue influence.[28] The most critical factors are whether the beneficiary (1) occupied a fiduciary or confidential relationship to the testator, (2) actively participated in the preparation or procurement of the will, and (3) received an "unusually or unnaturally" large portion of the estate.[29] Other factors are the "age or condition of health and mental vigor of the testator" and "the naturalness or unnaturalness of the will."[30] "Whether the existence of the . . . Dean factors raises a presumption of undue influence is a highly fact-specific determination that requires careful scrutiny of the totality of the circumstances."[31]

Seely asserts that there is no clear, cogent, and convincing evidence of undue influence, none of the Dean factors were met, and even if they were, she rebutted the presumption of undue influence. The trial court concluded there was no confidential or fiduciary relationship between Seely and Carlson and Seely did not receive an unusually large portion of the estate. Neither party challenges these findings. But the court did find that the remaining factors were met, which raised a presumption of undue influence.

---

[28] Melter, 167 Wn. App. at 296.
[29] Dean, 194 Wash. at 672.
[30] Dean, 194 Wash. at 672.
[31] Barnes, 185 Wn.2d at 11.

*A. Participation*

Seely claims that she was not sufficiently involved in the March 13 beneficiary change to have participated. "Participation in the transaction sufficient to support a presumption of undue influence requires that the beneficiary actively dictated the terms of transaction, purportedly on behalf of the decedent."[32] Seely contends that no evidence supports that she had any involvement because she was not present during Carlson's March 11 phone call with Fahey Sr. or during Carlson's March 13 meeting with Fahey Sr. and Fahey Jr. when Carlson signed the beneficiary change form. The trial court's findings are consistent with these facts.

But additional unchallenged findings include: (1) Fahey Jr. testified that he and Fahey Sr. had met once with Seely and her attorney about the beneficiary change before Carlson signed the form; (2) Fahey Sr. spoke with Seely about the beneficiary change before presenting it to Carlson for his signature; (3) Fahey Jr. noted, "On Thursday, 3/13, we saw [Carlson] in hospice. [Fahey Sr.] told him [Seely] told us they wanted to transfer his IRA to [Seely], so that she can pay for the care of his patients, along with another doctor. [Carlson] said this is correct, he just wants to get everything straightened out"; and (4) Seely testified that she gave Fahey Sr. directions about Carlson's IRA.

---

[32] Kitsap, 177 Wn. App. at 577.

Still, Seely maintains that she was not involved because Fahey Sr. testified that Seely never contacted him about Carlson's IRA before he met with Carlson at the hospice center. This testimony, however, does not conflict with the court's unchallenged findings showing that Seely was involved. The court did not find that Seely contacted Fahey Sr. about Carlson's IRA; they state only that Seely and Fahey Sr. discussed Carlson's IRA before Carlson signed the beneficiary change form. Seely also asserts that Fahey Jr.'s statement that Carlson wanted to transfer his IRA to Seely so she could pay for the care of his patients "cleanses the transaction." But because Carlson lacked the capacity to execute the beneficiary change form and because Carlson's statement could support either a finding of undue influence or the absence of undue influence, the fact that Carlson affirmed Seely's statement to Fahey Sr. about her and Carlson's alleged oral agreement does not mean that she did not participate.

The trial court also found that the day after Carlson signed the beneficiary change form, Seely visited Carlson with a document she prepared titled, "My Desires and Intentions." This document stated that Carlson's retirement money and the money from the sale of his periodontal practice were to be placed in an account to pay for any expenses related to caring for his remaining patients. It also stated that Carlson's share of the residence he owned with Seely would

-17-

become Seely's property. Rowles videotaped Seely's March 14 meeting with Carlson. The trial court described this video recording as follows:

> At all times during the March 14, 2014 videotape, Dr. Carlson was lying on his back nearly motionless in a hospital bed receiving supplemental oxygen. His eyes opened sporadically, but remain closed during most of the recording, which lasted five minutes and 31 seconds. Dr. Seely did almost all of the talking. Dr. Seely described Dr. Carlson's intentions. Dr. Carlson did not ask any questions or make any statements without prodding by Dr. Seely or Gina, who at one point directed him to agree that the statement "supersedes" his will. Gina observed that Dr. Carlson appeared to fall asleep at one point during the five-minute video remarking "You're kind of falling asleep. Were you awake for all of this?" Dr. Seely joked with Gina and Erik, while Dr. Carlson appeared to be unconscious or asleep throughout much of the tape. At the end of the video, when asked if he was "happy with" the document Dr. Seely had read, Dr. Carlson, heavily medicated and near death, stated: "I'm happy. I'm happy. Happy, happy. I'm very happy and you're happy. Clap your hands. Clap, clap." Gina testified that her father did not read the "My Desires and Intentions" document before signing it, and that Dr. Seely encouraged him to sign and gave him a pen.

The trial court found that Seely's behavior in procuring Carlson's signature on the "My Desires and Intentions" statement was corroborative of her undue influence over him on March 13. Seely challenges this finding. But based on the court's unchallenged interpretation of the video recording, substantial evidence supports this finding.

The trial court's conclusion that Seely actively participated in the IRA beneficiary change flows from its findings that Seely discussed the IRA transfer

with Fahey Sr. and encouraged Carlson to sign a document to that effect when he appeared incoherent and was near death.

*B. Carlson's Health*

Seely also challenges the court's conclusion that Carlson's ill health and declining mental state support that she exercised undue influence over him. But the court's unchallenged finding about Carlson's appearance and behavior in the March 14 video, its summary of the hospice chart notes and witnesses' observations showing Carlson's lack of capacity, and Seely's involvement support this conclusion.

*C. Unnaturalness of the Transaction*

Last, Seely challenges the trial court's conclusion that the beneficiary change was an unnatural transaction. The trial court concluded that the beneficiary change was contrary to Carlson's wishes as expressed to his lawyers in December 2013 when he removed Seely as beneficiary to his IRA and in March 2014 when he expressly excluded Seely from his will and did not include her in a subsequent codicil. The trial court also concluded, "The theory that Dr. Carlson gave [Seely] the IRA for agreeing to treat his patients is not supported by the evidence and appears to have been created after the fact to justify her actions." Select findings discussed above support these conclusions.

Seely contends the trial court confused Carlson's wishes about the distribution of his probate estate with his desire to compensate her for treating his patients by designating her the beneficiary of a nonprobate asset. But Carlson removed Seely as his IRA beneficiary when they separated. This is consistent with Carlson telling Sullivan that he did not want Seely to receive any part of his estate; it is inconsistent with him redesignating her as his beneficiary while he was in hospice six days before he died. The trial court's findings support its conclusion that the IRA beneficiary change was unnatural.

We decide that the trial court did not err in concluding that the above-discussed factors raised a presumption of undue influence and that Seely did not rebut this presumption.

### Attorney Fees and Costs

Both parties request an award of attorney fees under RAP 18.1 and RCW 11.96A.150, the Trust and Estate Dispute Resolution Act.[33] RAP 18.1 allows a reviewing court to award a party reasonable attorney fees if the party makes its request as RAP 18.1 provides and if applicable law grants a party the right to recover them. RCW 11.96A.150(1) authorizes fees, stating, "Either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party." The amount of fees is

---

[33] Ch. 11.96A RCW.

that which the court deems equitable after considering "any and all" relevant and appropriate factors.[34] Because the estate prevailed below and on appeal, we award the estate reasonable fees upon its compliance with RAP 18.1(d).

Both parties also ask that this court award them costs. RAP 14.2 generally requires a commissioner or clerk of an appellate court to award costs to the party that substantially prevails on review. Because the estate is the substantially prevailing party, we award costs to the estate.

CONCLUSION

We affirm. Substantial evidence in light of the highly probable standard supports all of the trial court's challenged findings of fact. The trial court's findings support its decision that Carlson did not have transactional capacity on March 13, 2014, to change his IRA beneficiary to Seely, making this change null and void. And the court's findings support its conclusion that the estate raised a presumption of undue influence, and Seely did not rebut it.

WE CONCUR:

---

[34] RCW 11.96A.150(1).