# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BROOKS ABEL,<br><br>                   Appellant,<br><br>      v.<br><br>GRANT COUNTY PUBLIC UTILITY<br>DISTRICT, KITTITAS COUNTY, STATE<br>OF WASHINGTON,<br><br>          Respondent. | No. 83348-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

ANDRUS, C.J. — Brooks Abel appeals the dismissal of his personal injury claim against the Grant County Public Utility District (District) after a jury found no factual basis to toll the statute of limitations, rendering his claim untimely. Abel contends the trial court erred in instructing the jury on the applicable burden of proof on competency and challenges its evidentiary ruling relating to certain cognitive assessments that the Washington Department of Social and Health Services (DSHS) conducted of Abel during the statute of limitations period.

We conclude the trial court correctly instructed the jury that Abel had to prove incompetency by clear, cogent and convincing evidence. We also conclude the trial court did not abuse its discretion in permitting the District to question Abel's expert and its own expert about the contents of the DSHS cognitive assessments. We therefore affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

The Quilomene Dune, also known as the Sandbar, is a state-owned undeveloped recreational site on the shore of the Columbia River. Grant County Public Utility District (the PUD) owns and operates the Priest Rapids Hydroelectric Project several miles downriver under a license issued by the Federal Energy Regulatory Commission (FERC). The hydroelectric project includes Wanapum and Priest Rapids Dams and is defined by a boundary that includes all lands and waters necessary for the operation and maintenance of the project, as well as other project purposes, including public recreation and protection of environmental and cultural resources. The Sandbar lies within this project boundary and the PUD has an easement from the State providing it access and control of the Sandbar for hydroelectric project recreational area purposes, consistent with its FERC license.

On May 1, 2016, Abel and several others visited the Sandbar on a boat owned by Abel's friend. The group anchored near the Sandbar and some of the group, including Abel, jumped off the side of the boat and waded to shore. The water was, at most, chest deep at the location the group anchored. A short while later, Abel returned to the boat and dove headfirst off the side. After he dove in, Abel's friends noticed he was floating face down in the water. When they went to his aid, they found him unresponsive, pulled him to shore, and attempted to resuscitate him. Abel was airlifted to Harborview Medical Center (Harborview) soon after.

As a result of this incident, Abel suffered a severe cervical spine injury that left him with decreased sensitivity and motor function from the chest down. He

stayed at Harborview for approximately two months and is now completely dependent on his family to care for his basic needs.

Abel filed his original complaint for negligence against the PUD on April 16, 2020, more than three years post-accident. The PUD raised, as an affirmative defense, that Abel's claims were barred by the statute of limitations. Abel alleged, however, that because of his "medications, intensive rehabilitation and the emotional trauma of his disabilities," his mental incapacity prevented him from understanding or appreciating "the nature of these legal proceedings" for approximately one year following his accident. Abel contended that the applicable three-year statute of limitations tolled during this period of incapacity under RCW 4.16.190.

At trial, a jury found that Abel failed to prove that he lacked the capacity to understand the legal proceedings by clear, cogent, and convincing evidence for the requisite period. The trial court accordingly entered a judgment upon the verdict dismissing the case as time-barred.

Abel appeals.

ANALYSIS

Abel does not dispute that his negligence claim is subject to the three-year statute of limitations contained in RCW 4.16.080(2) and that he filed this suit more than three years following his injury. He contends, however, that the trial court erred in instructing the jury on the correct standard for establishing incapacity to toll the statute of limitations, and that the trial court impermissibly allowed the PUD to elicit expert testimony about the contents of DSHS cognitive assessments. We reject both arguments.

Burden of Proof under RCW 4.16.190

Abel first argues that the trial court erred in instructing the jury that he must establish his lack of capacity to understand the legal proceedings by "clear, cogent and convincing evidence." He contends that the appropriate burden of proof under the tolling statute, RCW 4.16.190, is the preponderance of the evidence standard. We disagree.[1]

> RCW 4.16.190(1) provides
>
> if a person entitled to bring an action . . . [is] at the time the cause of action accrued . . . incompetent or disabled to such a degree that he or she cannot understand the nature of the proceedings, such incompetency or disability as determined according to chapter 11.130 RCW . . . the time of such disability shall not be a part of the time limited for the commencement of action.

The burden of proving events justifying the tolling of the statute of limitations rests upon the party asserting it. *Cannavina v. Poston,* 13 Wn.2d 182, 190-91, 124 P.2d 787 (1942).

> Jury instruction no. 8 provided:
>
> A plaintiff is presumed competent.
> A plaintiff has three years from the date of an injury to commence a lawsuit. This is known as the three-year statute of limitations.
> This three year time period to bring a lawsuit may be interrupted or stopped if a person is incompetent.

---

[1] We reject the PUD's argument that Abel waived this assignment of error by consenting to the jury instruction and verdict form containing the "clear, cogent, and convincing" standard. Under CR 51(f), a party that fails to adequately support an objection to a jury instruction may still preserve its appeal if the court is "clearly apprised" of the points of law in dispute. *Falk v. Keene Corp.*, 113 Wn.2d 645, 658, 782 P.2d 974 (1989). Similarly, this court may exercise its discretion to review any issue "arguably related" to issues raised before the trial court. *Lunsford v. Saberhagen Holdings, Inc.*, 139 Wn. App. 334, 338, 160 P.3d 1089 (2007). The parties engaged in extensive argument and briefing below concerning the correct standard for proving incompetency. Abel clearly objected to the clear, cogent and convincing burden of proof and argued that the correct burden for the affirmative defense is preponderance of the evidence. Although Abel did not subsequently object to the final burden of proof instruction, he adequately preserved the burden of proof issue for appeal through his pretrial briefing.

> A plaintiff has the burden of proving by clear, cogent, and convincing evidence that he became incompetent to such a degree that he could not understand the nature of the proceedings for which he claims the statute of limitations should be tolled.
>
> If you find this burden has been met, then the time for calculating the statute of limitations stops.
>
> Once the time for calculating the statute of limitations stops, a defendant may prove by a preponderance of the evidence that a plaintiff has regained capacity, such that he was no longer incompetent.

Abel argues this instruction misstated the law under RCW 4.16.190(1) because he should have been required to prove his incompetency by a preponderance of evidence standard generally applicable to civil actions. He contends that while RCW 4.16.190(1) requires a plaintiff to prove incompetency "as determined according to chapter 11.130 RCW," this language should be interpreted as not incorporating that statute's burden of proof standard. Abel maintains that under *Rivas v. Overlake Hospital Medical Center*, 164 Wn.2d 261, 189 P.3d 753 (2008), the tolling statute's reference to chapter 11.130 RCW, the Guardianship Act, incorporates only that act's definition of incompetency and not its provision relating to burden of proof.

Although we disagree with Abel's reading of *Rivas*, we conclude that even if the Guardianship Act's burden of proof provision does not apply to RCW 4.16.190, our common law does. Under our well-established common law, the law presumes competence and the burden of proving incompetency is proof by clear, cogent and convincing evidence.

We review the trial court's interpretation of RCW 4.16.190 and the Guardianship Act de novo. *Rivas*, 164 Wn.2d at 266. "When engaging in statutory interpretation, our goal is to ascertain and carry out the intent of the legislature."

- 5 -

*State v. Barbee*, 187 Wn.2d 375, 382, 386 P.3d 729 (2017). To determine legislative intent, we first look to the statute's plain meaning. *State v. Varnell*, 162 Wn.2d 165, 168, 170 P.3d 24 (2007). If the plain meaning of the statute is ambiguous, we may also determine legislative intent by reviewing legislative history. *Barbee*, 187 Wn.2d at 383.

RCW 4.16.190(1) provides that incompetency or disability is to be "determined according" to the Guardianship Act. Under the Guardianship Act, an adult is presumed competent and a court may appoint a guardian only for someone whose competency is established "by clear and convincing evidence." RCW 11.130.265(1)(a); RCW 11.130.310(1)(a). Under the plain language of RCW 4.16.190(1), to prove incompetency for the purpose of tolling the statute of limitations, a party must prove incompetency as one would be required to prove it under the Guardianship Act—with clear, cogent and convincing proof.

Our interpretation of RCW 4.16.190(1) is consistent with its legislative history as well. The statute was first enacted in 1854 when the territorial assembly passed a law providing that if one was "insane" at the time a cause of action accrued, the duration of that disability would not count in the running of the statute of limitations. LAWS OF 1854, § 11, at 364. The current version of the statute, passed in 1977, replaced the "outdated and offensive language, procedures and assumptions that have previously been used to identify and categorize mentally, physically, and sensory handicapped citizens." LAWS OF 1977, 1st Ex. Sess., ch. 80, § 1. The legislature explained:

> It is legislative belief that use of the undefined term "insanity" be avoided in preference to the use of a process for defining incompetency or disability as fully set forth in [the Guardianship Act];

that language that has allowed or implied a presumption of incompetency or disability on the basis of an apparent condition or appearance be deleted <u>in favor of a reference to necessary due process allowing a judicial determination of the existence or lack of existence of such incompetency or disability</u>.

*Id*. (emphasis added). The "process for defining incompetency" under the Guardianship Act involves the presentation of clear, cogent and convincing evidence to overcome the statutory presumption of competency.

Abel argues that our Supreme Court rejected this interpretation in *Rivas*. We disagree. In that case, a plaintiff filed a medical malpractice claim three years and one day after a medical procedure that caused her injuries. 164 Wn.2d at 265. She argued that she was incapacitated in the intensive care unit after her surgery and thus entitled to have the statute of limitations tolled for that period of time. *Id*. The court of appeals, in interpreting the phrase, "as determined according to [the Guardianship Act]," referred to the procedural requirements of the statute, including the requirement that the ward be given at least 10 days' notice of the petition, to hold that RCW 4.16.190(1) required the plaintiff to establish that her incapacity was of sufficient duration to permit a court to appoint a guardian and a four-day period of incapacity was too short in duration to toll the statute of limitations as a matter of law. *Rivas v. Eastside Radiology Associates*, 134 Wn. App. 921, 928-30, 143 P.3d 330 (2006).

The Supreme Court rejected the court of appeals' interpretation of RCW 4.16.190(1) and held that the temporal and procedural requirements for filing a guardianship petition and conducting a guardianship hearing were not relevant to determining whether the statute of limitations tolled. *Rivas*, 164 Wn.2d at 270. Instead, it held, the Guardianship Act "provides the substantive definition of

disability or incapacity for the purposes of tolling. In other respects, the statutes act independently." *Id.* It concluded that Rivas "was entitled to the benefit of former RCW 4.16.190 if she can persuade the trier of fact that she was incapacitated to the extent that she could not understand the nature of her cause of action when it accrued as determined under the substantive standards of the guardianship act." *Id.* at 271.

Abel argues that under *Rivas*, the Guardianship Act's burden of proof provision is "procedural" and thus inapplicable to RCW 4.16.190(1). Abel's reading of *Rivas* is unpersuasive for two reasons. First, that case did not address the Guardianship Act's burden of proof provision. Where a legal theory is not discussed in a case's opinion, that opinion is not controlling in future cases where the legal theory is properly raised. *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 824, 881 P.2d 986 (1994). The only legal issue addressed in *Rivas* was whether a period of incapacity of four days was long enough to toll the statute of limitations, given the Guardianship Act's 10-day notice requirement for petitions filed under that statute.

Second, while *Rivas* rejected the notion that the "temporal and procedural requirements" of the Guardianship Act were incorporated into RCW 4.16.190(1), the burden of proof is considered a substantive aspect of a claim, not a procedural rule. *Spratt v. Toft*, 180 Wn. App. 620, 636, 324 P.3d 707 (2014). We are unconvinced that the Guardianship Act's burden of proof provision can be equated with the act's notice requirements.

But even if the Guardianship Act's burden of proof provision does not apply to RCW 4.16.190(1), we must nevertheless refer to common law "to fill interstices

that legislative enactments do not cover." *Dep't of Soc. & Health Servs. v. State Pers. Bd.*, 61 Wn. App. 778, 783, 812 P.2d 500 (1991) (citing RCW 4.04.010).[2] Under well-established common law, the burden of proof required to overcome the presumption of competency in civil cases is that of clear, cogent and convincing evidence. *Grannum v. Berard*, 70 Wn.2d 304, 307, 422 P.2d 812 (1967); *Page v. Prudential Life Ins. Co. of America*, 12 Wn.2d 109, 110, 120 P.2d 527 (1942); *Roberts v. Pacific Tel. & Tel. Co.*, 93 Wash. 274, 288, 160 P. 965 (1916).

Abel argues that *Roberts* should not apply because the case is too old to be reliable and its holding is inconsistent with *Rivas*. Abel further contends that *Grannum* and *Page* are distinguishable because those cases arose in the context of one's capacity to execute a contract rather than one's incapacity for statute of limitations purposes under RCW 4.16.190.

In *Roberts*, a lineman working for the telephone company fell from a telephone pole, sustaining significant injuries. 93 Wash. at 276. The plaintiff brought suit four months after the expiration of the statute of limitations. *Id.* He argued that he was "insane" for a significant period of time after he was injured, spending four months in an asylum, and that his lawsuit was timely. The trial court instructed the jury that

> [A] person is presumed to be sane until he is proved to be otherwise, and that the burden is upon the person claiming insanity to prove it by clear and convincing evidence; but that when insanity of a fixed and settled nature is once established by such evidence, it is presumed to continue until it is overturned by proof of sanity. You

---

[2] RCW 4.04.010 provides:

> The common law, so far as it is not inconsistent with the Constitution and laws of the United States, or of the state of Washington nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state.

are, therefore, instructed that, if plaintiff established that he became and was insane on the day of the alleged injury, and such insanity was of a fixed and settled nature, it would be presumed that he continued insane until proven to be sane, and the burden would be upon the defendant to establish his subsequent sanity. Even though the plaintiff may have been insane on the day when injured, if it were established that he became and was sane on any subsequent day prior to January 14, 1911, then this action would be barred by the statute of limitations.

93 Wash. 286-87. The Supreme Court affirmed this instruction as a correct statement of Washington law. *Id.* at 287-88.

*Roberts*, despite its age, is directly on point and is thus binding on this court. *See 1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 578, 146 P.3d 423 (2006) ("A decision by this court is binding on all lower courts in the state"). Abel points to no case other than *Rivas* to suggest the Supreme Court has departed from the standard laid out in *Roberts.* But *Rivas* did not explicitly overrule *Roberts* and our Supreme Court does not overrule binding precedent sub silentio. *MP Medical Inc. v. Wegman*, 151 Wn. App. 409, 417, 213 P.3d 931 (2009).

Moreover, our Supreme Court has relied on *Roberts* in much more recent cases. In *Page*, the executrix of a decedent's estate sued to collect proceeds from the decedent's life insurance policies. 12 Wn.2d at 102. The insurer presented evidence that the decedent had contacted the insurer and requested to cash out his life insurance policies before his death. *Id.* at 104. The estate alleged the decedent lacked the capacity at the time of this request and the insurer was aware of his diminished mental capacity. *Id.* at 105. The court, citing to *Roberts,* stated:

The rule relative to mental capacity to contract, therefore, is whether the contractor possessed sufficient mind or reason to enable him to comprehend the nature, terms and effect of the contract in issue. In applying this rule, however, it must be remembered that contractual capacity is a question of fact to be determined at the time the

- 10 -

transaction occurred, that everyone is presumed sane; and that this presumption is overcome only by clear, cogent and convincing evidence.

*Page*, 12 Wn.2d at 109 (citations omitted).

And in *Grannum*, a plaintiff suing a physician for performing an allegedly unauthorized surgical procedure, claimed he was mentally incompetent at the time he gave his oral consent and signed the surgery consent form. 70 Wn.2d at 364. The Supreme Court, again relying on *Roberts*, held that the evidence that the plaintiff was depressed and heavily medicated was insufficient to overcome the presumption of competency and failed to establish incompetency by clear, cogent and convincing evidence. *Id.* at 309.

While Abel argues that *Page* and *Grannum* arose in the context of a plaintiff's competency to execute a contract rather than a plaintiff's incompetency to bring a lawsuit, he does not explain why this distinction is meaningful; in both contexts the plaintiff sought or seeks to overcome the legal presumption of competency in order to avoid the legal consequences of the plaintiff's action (signing a contract) or inaction (failing to file a lawsuit within the statute of limitations). We see no basis for imposing the clear, cogent and convincing burden of proof to void a contract because of one's incompetence and imposing a lower burden of proof to overcome the statute of limitations because of one's incompetence. The trial court did not err in giving jury instruction no. 8.

Admissibility of DSHS Assessments

Abel next argues that we should reverse the jury's verdict because the trial court erred in excluding evidence that DSHS had performed several cognitive assessments following his accident, in which it deemed him to have no cognitive

impairment. We conclude that to the extent there was any error in impeaching Abel's expert about the content of these assessments, it was harmless.

Before trial, the PUD identified six exhibits it intended to offer reflecting evaluations that DSHS performed to assess Abel's eligibility for long term care benefits and services. Abel sought to exclude any reference to the DSHS assessments on three grounds: they were generated for the purpose of determining Abel's eligibility for collateral source benefits, the documents were not statements made for purposes of medical diagnosis and treatment under ER 803(a)(4) but to determine eligibility for government benefits, and the evidence was unfairly prejudicial and thus inadmissible under ER 403. During argument on the admissibility of the records, Abel raised the additional concern of "an expert bootstrapping someone else's conclusions, which goes to . . . ER 703." The PUD argued that it could question its own expert about the content of the assessments if he relied on them in forming his opinions on Abel's competency and it could ask Abel's experts if they considered the information in forming their opinions.

The trial court granted Abel's motion in part, allowing the PUD to elicit testimony about the assessments through the parties' respective experts, but requiring the PUD to remove any reference to insurance or third-party payment of benefits before offering the exhibits.

The PUD did not offer the exhibits as substantive evidence at trial. Instead, it used the records to cross examine Abel's expert, Dr. Martha Glisky. Dr. Glisky, a neuropsychologist, testified that for the first year after Abel's injury, he was cognitively and psychiatrically impaired to such an extent that he did not have "the cognitive bandwidth to understand and participate in legal proceedings." Dr. Glisky

relied on the fact that initially, he was so heavily medicated that he was unable to process anything for the first month after his injury. After he left the hospital, Dr. Glisky stated, he became depressed and actively suicidal. His severe depression, in her opinion, rendered Abel incapable of participating in and understanding legal proceedings.

On cross examination, Dr. Glisky acknowledged that during that same year, Abel was capable of consenting to various medical procedures and treatment, and was able to understand the information his medical providers provided him about his condition. She also admitted that when Abel was discharged from Harborview in July 2016, two months after the accident, his medical records indicated he scored a "7" on a cognitive assessment using a "Functional Independent Measure" in which a "1" meant in need of total assistance and a "7" meant complete independence. He received a similar score for problem solving, memory and social interactions. Dr. Glisky also agreed that Abel had been assessed when he began rehabilitation and his psychological assessment concluded that he was cooperative, engaged, alert, attentive, with no memory deficits.

At that point, the PUD asked Dr. Glisky about the assessments of Abel's cognition performed by DSHS. Dr. Glisky acknowledged she had been provided copies of assessments performed on July 6, 2016, January 4, 2017, March 20, 2017, July 7, 2017, and July 20, 2019. She testified that each document contained a "cognitive performance scale" or CPS score of zero. She acknowledged that this score, according to the key in the documents, corresponded to the assessment that Abel had exhibited no problems with decision-making abilities, making himself understood, or recalling recent events.

On redirect, Dr. Glisky explained that while she has seen and used these documents with her own patients, the CPS scores did not change her opinion about Abel because the scores are "a very basic screening measure" that evaluates "basic interactions and conversations." And she did not know the credentials or educational experience of the individual who performed Abel's assessments.

In the PUD's case in chief, it called Dr. Mark McClung to testify about his assessment of Abel's ability to understand the nature of legal proceedings during the same period of time. Dr. McClung, a forensic psychiatrist, testified that for the first two months of Abel's hospitalization, he was not competent to make decisions about initiating a lawsuit because of the level of pain he was experiencing and pain medications he was taking. But, Dr. McClung said, by mid-July 2016, there was nothing in Abel's medical records to suggest he was experiencing any cognitive impairments or having difficulties making decisions.

Dr. McClung walked the jury through Abel's Harborview occupational and physical therapy records and discharge summary, the October 2016 rehabilitation psychological evaluation, and the medical records from his primary care provider from January 2017. In each of these medical records, Dr. McClung opined that Abel demonstrated his ability to participate fully in therapy, was highly motivated to succeed, was doing an excellent job in retaining the information his care team provided regarding his spinal cord injury, was able to communicate his wishes and needs and was comfortable doing so.

Dr. McClung then discussed the CPS scores contained in the DSHS assessments. He explained:

- 14 -

> A CPS score is a – is a brief scoring tool. It's mainly done by observation, more than questionnaire, looking at whether someone can make themselves understood, whether or not they can make decisions and that appears – and if their short-term memory is intact.
>
>      . . . .
> It's primarily done by observation. There can be a short – there can be a short questionnaire that specifically looks at someone's ability to remember, say, a list of words or numbers after a few minutes. But my understanding, from the way that [it] is used, it's primarily a score based on observations of the patient.

Dr. McClung testified that the lower a CPS score, the less impairment that is present and the higher the score, the more problems are seen with verbal communication, memory or decision-making. And a score of zero, according to Dr. McClung, suggests there is no impairment seen by the provider.

Dr. McClung disagreed with Dr. Glisky's opinion that Abel's mental health rendered him incapable of understanding or participating in legal proceedings:

> I'd say overall my disagreement [with Dr. Glisky] is that she appears to be asserting that Mr. Abel's symptoms of anxiety, depression, and suicidality, you know, rendered him incompetent, unable to – unable to think, unable to cognitively function about a conversation regarding potential litigation or legal issues.
>      And, again, I would go back to what I had talked about before; that those symptoms change someone's willingness. It changes someone's resilience. It changes someone's ability to stick to – focus and stick to things for an extended period of time. But it would not render him absolutely unable to do that by any means.
>      . . . .
> And given – again, given the scores I see and the clinical observations from July of 2016 on, no one is describing – none of the clinicians or caregivers who work with him are describing any observable difficulties with his communication, with his memory, with his ability to communicate a preference or make decisions. And that's – and that's during periods when he was significantly depressed, during periods when he was frequently suicidal.

Abel argues the trial court erred in allowing the PUD to question the two experts about the CPS scores because it effectively permitted the PUD to offer the

hearsay opinions of a nontestifying expert. We review the trial court's evidentiary rulings for abuse of discretion. *Kirk v. Wash. State Univ.,* 109 Wn.2d 448, 459, 746 P.2d 285 (1987).

ER 703 permits experts to base their opinions on facts not otherwise admissible if they are of a type reasonably relied on by experts in the particular field. *In re Detention of Marshall,* 156 Wn.2d 150, 162, 125 P.3d 111 (2005). "Thus, the rule allows expert opinion testimony based on hearsay data that would otherwise be inadmissible in evidence." *Id.* In addition, ER 705 grants the trial court discretion to allow the expert to relate hearsay or otherwise inadmissible evidence to the trier of fact to explain the reasons for his or her expert opinion, subject to appropriate limiting instructions. *Id.* at 163.

Abel contends that, while ER 703 may permit an expert to express an opinion based upon facts or data that are not themselves admissible into evidence, a party may not question an opposing party's expert about the contents of reports authored by nontestifying witnesses. He relies on *Washington Irrigation and Development Co. v. Sherman*, 106 Wn.2d 685, 724 P.2d 997 (1986) for this argument.

In *Sherman*, an injured worker filed a disability claim based on an on-the-job back injury. The Department of Labor and Industries (Department) found that Sherman had a permanent partial disability. *Id.* at 686. Sherman subsequently sought to reopen his claim, alleging that his injury had worsened. *Id.* The Department denied the application, but the Board of Industrial Insurance Appeals (Board) found that Sherman's condition had become so aggravated that he was

permanently and totally disabled. *Id.* at 686-87. At a trial in superior court, a jury reversed the Board's decision.

On appeal, Sherman challenged the trial court's ruling allowing the Department to introduce evidence, through the cross examination of Sherman's medical expert, on the fact that Sherman's medical providers had noted degenerative changes in his spine that would have existed before his industrial injury. *Id*. at 687. Sherman argued the evidence was inadmissible hearsay because the author of the report did not testify. *Id.* The Department argued that discussion of the medical reports was properly allowed under ER 703 and 705.

The Supreme Court held that the medical records were hearsay under ER 802 and questioning the worker's expert about the contents of medical records on which that expert did not rely in forming their opinion was improper under ER 703 and 705 because it "improperly put before the jury both a diagnosis of Sherman's condition and an inference that his condition was not causally related to the industrial injury." *Id.* at 687. "Until defendant established that plaintiff had relied on the report of the other doctor, it was improper for the defendant to read from that report in cross-examining plaintiff's witness." *Id.* at 689. It determined that the error was not harmless because the inadmissible evidence went to the "central issue" of the case—the cause and extent of the worsening of Sherman's condition." *Id.* at 690.

Since *Sherman*, this court has recognized that it is improper to impeach an expert witness's testimony with the contents of a nontestifying professional's report that the witness had seen but not relied on in formulating opinions. *State v. Hamilton*, 196 Wn. App. 461, 477-78, 383 P.3d 1062 (2016).

The PUD contends that it is sufficient under *Sherman* for an expert to have seen the medical records and points to the fact that Dr. Glisky had not only reviewed the DSHS assessments but she testified she had used similar assessments as a basic screening tool with her own patients in the past. But the testifying expert witnesses in *Sherman* and *Hamilton* had both seen and reviewed the otherwise inadmissible reports. 106 Wn.2d at 687. The courts nevertheless concluded that the proponent of the evidence had not established that the experts had relied on them to form their opinions.

In this case, the PUD did not establish that Dr. Glisky relied on the DSHS evaluations in formulating any of her opinions on Abel's incapacity. While she testified she had seen them, she clearly testified that she believed the screening was too superficial to have any value. The only inference we can draw from Dr. Glisky's testimony is that she did not rely on the DSHS documents because she deemed them unreliable. Under *Sherman*, the PUD's mode of impeaching Dr. Glisky's opinion—by reading the contents of the DSHS assessment—was not authorized by ER 703 or 705.

Nevertheless, unlike *Sherman*, we conclude the error was harmless because the evidence was admissible through Dr. McClung. Error in the inclusion of hearsay evidence is harmless unless it was reasonably probable that it changed the outcome of the trial. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). The PUD established that Dr. McClung relied on these records in forming his opinions. Unlike Dr. Glisky, Dr. McClung listed the DSHS evaluations as among the materials he used to formulate his opinion on Abel's capacity. Under ER 703 and 705, nothing prohibited the PUD from asking Dr. McClung about the

content of these assessments and the impact of them in formulating his opinions. The trial court did not abuse its discretion in allowing the PUD to question Dr. McClung about the content of these evaluations. *See In re Det. of P.K.*, 189 Wn. App. 317, 324-25, 358 P.3d 411 (2015) (trial court did not abuse its discretion in permitting an expert witness social worker to testify to the contents of patient's medical records that were not entered as substantive evidence and were used as a basis for the social worker's opinion on the patient's mental state). This case is distinguishable from *Sherman* because, here, the contents of the objectionable records were properly admitted through the defense expert, Dr. McClung.

Given that the content of the assessments was admissible to explain the basis of Dr. McClung's opinions, cross examining Dr. Glisky about the same information did not change the outcome of this trial. Any error in the PUD's method of cross-examining Dr. Glisky was therefore harmless.

<u>Admissibility of Abel's Alcohol Consumption</u>

Abel next argues that the trial court erred in admitting evidence that he had consumed alcohol on the day of his accident, thereby tainting the jury and causing prejudice to the case as a whole, including the jury's verdict that he had failed to establish incompetency. We conclude that the evidence, even if inadmissible, was harmless.

Abel relies on *Needham v. Dreyer*, 11 Wn. App. 2d 479, 454 P.3d 136 (2019), a medical negligence case, in which this court held that the trial court erred in allowing a defense expert to testify that the plaintiff suffered from chronic alcoholism and his alcohol use on the day of the doctor visit at issue could have caused his injuries. We reversed the jury verdict that no breach of the standard of

care had occurred because the expert testimony was so pervasive and inflammatory that it likely affected the jury's perception of the plaintiff.  Id. at 495-97.

The *Needham* case is distinguishable because the plaintiff freely admitted his alcohol consumption, whereas Abel did not.  Moreover, the PUD expert described Abel's blood alcohol level as 0.03 mg/DL, a level well below the legal limits.  While there was lay testimony that Abel and his friends were drinking alcohol, the witnesses all testified Abel was not inebriated and showed no signs of impairment, such as slurred speech or impaired balance.  The record here was not "replete with prejudicial discussion" of Abel's alcohol use, as it was in *Needham*. 11 Wn. App. 2d at 498.  Instead, the trial court limited the expert testimony here to Abel's blood alcohol content when he arrived at the hospital.

Finally, the jury decided this case on statute of limitations grounds, an issue with no logical connection to the fact of Abel's consumption of alcohol on the day of the accident.

We thus conclude that any error in the admission of evidence that Abel consumed alcohol on the day of his accident was harmless.

Recreational Use Immunity Ruling

Finally, Abel challenges the trial court's decision that RCW 4.24.210, the recreational use immunity statute, applied as a matter of law.  He contends this ruling constituted "structural error" in his trial.  But our Supreme Court has held that the doctrine of structural error is strictly limited to criminal trials. *In re Det. of Reyes*, 184 Wn.2d 340, 346, 358 P.3d 394 (2015).  And Abel draws no connection between the court's ruling on the recreational use immunity statute and the jury's

- 20 -

verdict on statute of limitations. The trial court's decision that the PUD met the elements of recreational use immunity as a matter of law cannot reasonably be said to have affected the jury's verdict on the statute of limitations and any error is the trial court's ruling on recreational use immunity was also harmless.

Affirmed.

_Andrus, C.J._

WE CONCUR:

_Chung, J._          _Coburn, J._